UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| INDIANA HARBOR BELT RAILROAD COMPANY, <br><br> Plaintiff, <br><br> v. <br><br> UNITED TRANSPORTATION GROUP, INC. and MICHAEL V. PELLIN, individually and d/b/a United Rail Service Inc., <br><br> Defendants. | CAUSE NO.: 2:17-CV-287-TLS |

**OPINION AND ORDER**

This matter is before the Court on the Defendants' Amended Motion for Partial Summary Judgment [ECF No. 80], which is fully briefed and ripe for ruling. For the reasons set forth below, the Court denies the Defendants' motion. This case will proceed to trial.

**PROCEDURAL BACKGROUND**

On July 3, 2017, the Plaintiff, Indiana Harbor Belt Railroad Company (IHB), filed a Complaint [ECF No. 1] against the United Transportation Group, Inc. (UTG) and United Rail Service Inc. (United Rail), seeking to recover $197,150 in rates and charges allowed under the Interstate Commerce Commission Termination Act, 49 U.S.C. § 10101, et seq. Nearly a year later, IHB filed an Amended Complaint [ECF No. 53] on June 27, 2018, which substituted United Rail with Michael Pellin, both individually and doing business as United Rail, because United Rail was administratively dissolved.

On February 28, 2020, the Defendants filed a Motion for Partial Summary Judgment [ECF No. 71] but sought to amend the motion in order to correct an error in Mr. Pellin's

declaration and to withdraw certain arguments. *See* Mot. to Correct 1, ECF No. 75. After the Court granted the motion, *see* ECF No. 79, the Defendants filed their Amended Motion for Partial Summary Judgment [ECF No. 80] on June 29, 2020. IHB filed a Response on July 13, 2020 [ECF No. 84], and the Defendants filed a Reply on July 27, 2020 [ECF No. 86].

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The nonmoving party must marshal and present the Court with evidence on which a reasonable jury could rely to find in its favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). A court must deny a motion for summary judgment when the nonmoving party presents admissible evidence that creates a genuine issue of material fact. *Luster v. Ill. Dep't of Corr.*, 652 F.3d 726, 731 (7th Cir. 2011) (citations omitted). A court's role in deciding a motion for summary judgment "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Heochst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Facts that are outcome determinative under the applicable law are material for summary judgment purposes. *Smith ex rel. Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997). Although a bare contention that an issue of material fact exists is insufficient to create a factual dispute, a court must construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences in that party's favor, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491–92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

**FACTUAL BACKGROUND**

This case is about whether the Defendants owe IHB $197,150 in freight, demurrage, and hold charges that accrued between 2014 and 2016 while the parties conducted business together. *See* Am. Compl. ¶¶ 14–16, 18, ECF No. 53. IHB is a common carrier by rail that delivered rail cars to a facility in East Chicago, Indiana, where the Defendants operated a rail car cleaning business. *See id.* at ¶¶ 2, 10, 13–14; Def. Ex. 1, ¶¶ 4, 6, ECF No. 81-1. As an interstate carrier by rail, IHB was subject to various regulations and tariffs that were filed with the Surface Transportation Board, and the Defendants were obligated to pay any applicable rates or charges published in the governing tariff. *See* Am. Compl. ¶ 12; Answer ¶ 12, ECF No. 59.

The corporations providing rail car cleaning services at the East Chicago location included United Rail and UTG. *See* Def. Ex. 1, ¶¶ 4, 6. Mr. Pellin was the president and sole shareholder of both UTG and United Rail, managing much of those businesses' operations. Pl. Ex. 11, 20:10–16, 60:17–19, 77:25–79:17, ECF No. 85–11; *see also* Def. Ex. 1, ¶¶ 2, 3. Additionally, Mr. Pellin owned other companies that were associated with the East Chicago facility, including Powerhouse, Inc., Fast Tank Corporation, and Kaizen. Pl. Ex. 11, 43:15–23, 82:11–15, 170:7–9; *see also* Pl. Ex. 24, ECF No. 85-24. Powerhouse owned the physical assets and some of the land at the East Chicago location, and it charged monthly rent to UTG for using the building, tracks, and equipment at the site. Pl. Ex. 11, 42:12–43:13, 168:22–169:12. Fast Tank Corporation also owned a portion of the East Chicago premises that it leased to UTG. *Id.* at 170:2–22. And finally, Kaizen employed the individuals working at the East Chicago facility. *Id.* at 82:11–15. UTG, United Rail, Powerhouse, and Fast Tank were all incorporated in Illinois, while Kaizen was incorporated in Indiana. *See* Pl. Ex. 24.

3

When IHB delivered rail cars to the East Chicago facility, its primary point of contact was Kim Guill, who was a Kaizen employee working on behalf of the Defendants. Pl. Ex. 11, 81:8–82:6. Typically, IHB would notify the Defendants that a rail car arrived and, depending on where the car could be received, it would deliver the car to the track running into the facility. *See* Pl. Ex. 4, ¶¶ 5–8, ECF No. 85-4; Pl. Ex. 8, ¶¶ 13–14, ECF No. 85-8; Def. Ex. 1, ¶ 13. The standard procedure was for IHB to deliver the cars in the same order that IHB received them. Pl. Ex. 4, ¶ 5; *see* Def. Ex. 1.A, ECF No. 72-1.[1]

Beginning in 2014, issues started cropping up. *See* Def. Ex. 1, ¶¶ 14–15. IHB states that there were an increasing number of the Defendants' rail cars being stored on IHB's tracks because the Defendants were unable to receive them. Pl. Ex. 4, ¶¶ 6–7; Pl. Ex. 7, ¶¶ 5–6, ECF No. 85-7. As a result, IHB required the Defendants to specifically tell IHB which cars they wanted delivered to the East Chicago facility. Pl. Ex. 7, ¶¶ 7, 22. If IHB was required to hold cars that the Defendants did not have room for, it would charge the Defendants for demurrage in accordance with its Demurrage Tariff, Series 6004A. *Id.* at ¶¶ 5, 8, 14; Pl. Ex. 8, ¶¶ 17–20. As a result of the problems with delivering cars, IHB assessed the Defendants significant demurrage charges, Pl. Ex. 7, ¶ 5, which, at the time the case was filed, totaled $163,450, *see* Compl. ¶ 7, ECF No. 1; Am. Compl. ¶ 15.

Mr. Pellin felt that IHB unilaterally changed how the parties previously conducted business, and he claims to have never received a copy of the demurrage tariff. Def. Ex. 1, ¶¶ 14–15. However, Daniel Kelley, IHB's Director of Human Resources and Labor Relations, states that he had conversations with Mr. Pellin and Ms. Guill about the problems with delivering cars,

---

[1] Mr. Pellin's Amended Declaration refers to Exhibits 1.A, 1.B, and 1.C, but those exhibits are not included with his amended declaration. *See* Def. Ex. 1, ¶¶ 13, 17, 18. However, it appears they refer to the same exhibits appended to his original declaration. *See* Def. Exs. 1.A, 1.B, 1.C, ECF No. 72-1.

including assessment of demurrage charges. Pl. Ex. 7, ¶ 8. IHB also shows that it would have provided notice of the demurrage tariff to the Defendants. *See, e.g.*, Pl. Ex. 1, ECF No. 85-1; Pl. Ex. 7, ¶ 13; Pl. Ex. 9, ¶ 6, ECF No. 85-9; Pl. Ex. 10, 88:17–91:13, ECF No. 85-10.

In light of the ongoing difficulties with car deliveries, Mr. Kelley and Tamara Winterfeldt (IHB's Director of Customer Service/Crew Management) met with Mr. Pellin on March 24, 2015, to discuss how the cars were being handled by the Defendants and to find ways to avoid future demurrage charges. Pl. Ex. 7, ¶ 11; Pl. Ex. 9, ¶ 4. Mr. Pellin claims that IHB promised at the meeting to provide documentation for the basis of the demurrage bills as well as a copy of the tariff. Def. Ex. 1, ¶ 17. IHB disputes this, however, and Mr. Kelley and Ms. Winterfeldt claim there was no discussion of the overdue demurrage charges other than to say it should be discussed with Leo Pauwels (IHB's Director of Sales and Industrial Development); there were no promises to provide documentation or a copy of the tariff; and there was no indication that Mr. Pellin lacked previous notice of the tariffs. Pl. Ex. 7, ¶¶ 11–16; Pl. Ex. 9, ¶¶ 6–9.

On April 29, 2015, Mr. Pellin sent a follow up email, which requested the "demurrage rule book or system" to help him understand how charges will be assessed in the future and asked to be referred to the person who had authority to address past demurrage charges. Def. Ex. 1.B, ECF No. 72-1. Mr. Kelley responded that he would follow up on the demurrage chart and reiterated that Mr. Pauwels could address previous demurrage charges. *Id.* Mr. Kelley also said that if Mr. Pellin was unwilling to address it with Mr. Pauwels, then he should find another person to represent the Defendants' interests. *Id.* That person was the Defendants' attorney, who sent a letter to IHB on May 14, 2015, challenging the imposition of the demurrage charges (as well as other charges) and blaming IHB for various performance issues. Pl. Ex. 9, Decl. Ex. I-1, ECF No. 85-9.

5

The following year, on September 30, 2016, Mr. Pellin closed on a sale of his companies' assets located at the East Chicago facility to Lakeshore Railcar Services LLC. *See* Pl. Ex. 20, ECF No. 85-20. The majority of the proceeds from that sale went to Powerhouse and Fast Tank because they owned the property, while UTG received less than $25,000 from the sale of certain permits. *See* Pl. Ex. 11, 157:3–159:17; Pl. Ex. 18, at 2, ECF No. 85-18. Following the closing, the Defendants had about five weeks until some of their employees, including Ms. Guill, were hired by Lakeshore. Pl. Ex. 11, 181:3–18.

On November 10, 2016, Ms. Guill emailed IHB to ask for the current aging reports that reflected the amount UTG owed to IHB. Pl. Ex. 21, ECF No. 85-21. Paula Wratten, IHB's Manager of Pricing Services, appears to have reached out to Ms. Guill and explained that $255,240 was owed to IHB as of September 30, 2016. *Id.* Mr. Pauwels also responded to the email stating that UTG owed $255,240 and that "IHB will no longer allow UTG to make monthly payments as there is no assurance that UTG will still be a legal entity to make payments moving forward." *Id.* He went on to say that "IHB views these bills as due and payable immediately. If the sum is not received promptly then we will review all of our options for collection of this debt." *Id.* These emails were forwarded to Mr. Pellin. *See* Pl. Ex. 11, 181:19–183:20.

On December 12, 2016, IHB sent the Defendants another aging report, which reflected additional freight charges. *See* Pl. Ex. 13, ECF No. 85-13. On December 27, 2016, Mr. Pellin delivered a check to IHB for $26,800,[2] which would be void after 90 days. Def. Ex. 1, ¶ 18; *see* Def. Ex. 1.C, ECF No. 72-1. Included with the check was the December 12, 2016 aging report;

---

[2] Although the aging reports indicates that there was more than $26,800 in freight charges due, *see* Pl. Ex. 13, IHB acknowledges that $26,800 was the balance for the freight charges because money was being credited against those charges to offset the cost of damage caused by a derailment, *see* Am. Compl. ¶ 14.

however, Mr. Pellin modified it to show that the payment for $26,800 was a "Final Payment," and that the balance as of December 31, 2016, was zero. Pl. Ex. 14, ECF No. 85-14. A couple weeks later, Mr. Pellin emailed Ms. Wratten to ask whether IHB had received the check. Pl. Ex. 15, ECF No. 85-15. Ms. Wratten responded that IHB received the check but had not cashed it, explaining that "[d]ue to the correspondence included with the check, it has been forwarded to our legal department for further handling." *Id.* IHB never cashed the check. Def. Ex. 1, ¶ 18.

The following month, on January 17 and 26, 2017, Terry West, IHB's Purchasing & Cost Accounting Manager, emailed Ms. Guill to try and resolve the outstanding balance owed to IHB, which was $180,702.13. Pl. Ex. 16, ECF No. 85-16. Ms. Guill responded that she no longer worked for UTG but suggested that Ms. Wratten would know who to contact. *Id.* Mr. Pellin claims that these emails were never forwarded to him. Pl. Ex. 11, 186:22–188:19.

On July 3, 2017, IHB filed suit against UTG and United Rail. ECF No. 1. After the case was initiated, Defendants' counsel at the time wrote a letter to IHB informing it that United Rail had been involuntarily dissolved in 2009 and explained that UTG would be the only viable Defendant. Pl. Ex. 18, at 1. The letter also stated that after the sale of assets in 2016 and the closing out of accounts, UTG had less than $5,000 in its bank account. *Id*. at 2–3. Mr. Pellin confirmed that there was not enough money in the bank account to cover the check for $26,800 because he had spent the money on legal fees when the check became stale. Pl. Ex. 11, 147:8–149:15.

On June 27, 2018, IHB amended its complaint to substitute United Rail with Mr. Pellin, both in his individual capacity and in his capacity doing business as United Rail. *See* Am. Compl. ¶ 3. Also in 2018, Mr. Pellin had United Rail reinstated following its administrative dissolution in 2009. Def. Ex. 1, ¶¶ 9, 10. When United Rail was dissolved in 2009, the Illinois

7

Secretary of State issued a notice of dissolution to Mr. Pellin as the corporation's registered agent. Am. Compl., Ex. A, ECF 53-1. The document stated that United Rail "failed to file an annual report and pay an annual franchise tax." Pl. Ex. A. Mr. Pellin apparently stopped filing corporate disclosure forms and failed to pay any registration fees during the period of dissolution—though he did pay them back upon reinstatement. *See* Pl. Ex. 11, 97:1–98:25. During the period of dissolution, Mr. Pellin did, however, file foreign corporation registration forms for United Rail with the State of Indiana. *See* Pl. Ex. 17, ECF No. 85-17.

Ultimately, Mr. Pellin claims that he was unaware of United Rail's dissolution and that any failure to pay fees was an oversight. Def. Ex. 1, ¶ 9; *See* Pl. Ex. 11, 98:19–25. He further states that United Rail had ceased operations in 2001 and that he was solely conducting business through UTG, but he admits to maintaining United Rail's corporate existence in order to keep rights to the name. Def. Ex. 1, ¶¶ 5, 7. IHB challenges these claims, presenting evidence that, among other things, bills of lading were issued showing United Rail as the shipper of cars, that there continued to be a website for United Rail, and that other interactions with the Defendants suggested United Rail's continued operations. *See, e.g.*, Pl. Exs. 4-1, 4-2, 4-3, ECF No. 85-4; Pl. Ex. 5, ECF No. 85-5; Pl. Ex. 7, Decl. Ex G-2, ECF No. 85-7. IHB employees also state that they were never informed that United Rail ceased business operations. *See, e.g.*, Pl. Ex. 4, ¶¶ 4, 9; Pl. Ex. 7, ¶¶ 19–21; Pl. Ex. 8, ¶¶ 8–9.

## ANALYSIS

In their Motion for Partial Summary Judgment, the Defendants argue that (1) Mr. Pellin is entitled to judgment on his personal liability because United Rail has been reinstated and absolves him of liability, and (2) their obligation to pay $26,800 in freight charges should be suspended because they previously tendered a check that has not been presented for payment or

been dishonored.³ However, once the Court sorts out the parties' legal arguments, it is clear there are too many disputed facts that need to be decided by a jury. Therefore, the Court denies the Defendants' Motion for Partial Summary Judgment as to Mr. Pellin's personal liability and the $26,800 in freight charges. Those issues will be discussed in turn.

**A.      Whether Mr. Pellin Can Be Personally Liable**

Mr. Pellin argues that he cannot be held personally liable for the charges because they are United Rail's obligations now that the corporation has been reinstated in Illinois. At the outset, IHB disputes whether Illinois or Indiana law should govern the scope of Mr. Pellin's personal liability vis-à-vis his position as United Rail's president and sole shareholder. Since both parties seem to agree that Indiana law applies to this case,⁴ that is what the Court will look to. And on this issue, it is clear: "The law of the jurisdiction of formation of an entity governs . . . the liability that a person has as an interest holder or governing person for a debt, obligation, or other liability of the entity." Ind. Code. § 23-0.5-5-1(a)(2). That means Illinois law governs the question of whether Mr. Pellin will be personally liable for the charges in light of United Rail's reinstatement because United Rail is incorporated in Illinois. IHB's arguments based on Indiana Code § 23-0.5-5-1(c) and § 23-17-26-3 are misplaced. Section 23-0.5-5-1(c) simply provides

---

³ The Defendants also sought summary judgment on the demurrage charges, but they abandoned this argument in their Reply, recognizing that there are disputed issues of fact. *See* Def. Reply 7, ECF No. 86.

⁴ While the parties disagree about how Mr. Pellin's personal liability should be assessed, they both assume that Indiana law applies to this case. *See Wis. Cent. Ltd. v. TiEnergy, LLC*, 894 F.3d 851, 857 n.6 (7th Cir. 2018) (applying Illinois law in a rates case and noting that "[t]he parties do not explicitly address the choice-of-law issue, but they both assume that Illinois law applies to the indemnification and contribution claims"). Indeed, the Defendants rely on Indiana Code § 23-0.5-5-1(a)(2) to conclude that Illinois law applies, while IHB suggests that Indiana Code § 23-0.5-5-1(c) and § 23-17-26-3 undermine that view. Thus, the parties' dispute about whether Indiana versus Illinois law applies only arises because of their disagreement about how Indiana law addresses the issue of an individual's personal liability in relation to their position as an officer of a corporation.

that, in Indiana, foreign corporations do not have any extra authority or powers that domestic corporations cannot exercise. *See id.* § 23-0.5-5-1(c). Section 23-17-26-3, which was repealed effective January 1, 2018, dealt with obtaining certificates of authority and had nothing to do with a corporate officer's personal liability. *See id.* § 23-17-26-3 (2016). Thus, whether Mr. Pellin can be personally liable for these charges (as opposed to United Rail) is determined by Illinois corporate law.

Turning to that issue, Mr. Pellin relies on a statute dealing with the reinstatement of a corporation following an administrative dissolution, which provides, in relevant part:

> (d) Upon the filing of the application for reinstatement, the corporate existence for all purposes shall be deemed to have continued without interruption from the date of the issuance of the certificate of dissolution, and the corporation shall stand revived with such powers, duties and obligations as if it had not been dissolved; and all acts and proceedings of its shareholders, directors, officers, employees, and agents, acting or purporting to act in that capacity, and which would have been legal and valid but for such dissolution, shall stand ratified and confirmed.
>
> (e) Without limiting the generality of subsection (d), upon the filing of the application for reinstatement, no shareholder, director, or officer shall be personally liable, under Section 8.65 of this Act or otherwise, for the debts and liabilities of the corporation incurred during the period of administrative dissolution by reason of the fact that the corporation was administratively dissolved at the time the debts or liabilities were incurred.

805 Ill. Comp. Stat. 5/12.45(d)–(e). Mr. Pellin argues that application of the statute to this case is straightforward: once United Rail was reinstated in 2018, he could no longer be held personally liable for any of the charges. IHB responds that Mr. Pellin was holding himself out as United Rail during the relevant time period despite knowing that the corporation was dissolved and that Illinois has a policy of holding corporate officers personally liable in these types of circumstances. Ultimately, the disputed facts about the manner in which Mr. Pellin conducted business with IHB and his purpose in reinstating United Rail are relevant to whether Mr. Pellin is absolved of personal liability under section 5/12.45.

10

When interpreting an Illinois statute, the Court follows Illinois rules of statutory interpretation. *See Adams v. Catrambone*, 359 F.3d 858, 862 (7th Cir. 2004). The goal of statutory construction "is to ascertain and give effect to the intention of the legislature," and "the most reliable indicator of legislative intent is the language of the statute." *Roberts v. Alexandria Transp., Inc.*, __ N.E.3d __, 2021 WL 2460253, at *4 (Ill. June 17, 2021). That language is "given its plain and ordinary meaning." *Id.* The Court does not consider words and phrases in isolation, but rather interprets them "in light of other relevant provisions and the statute as a whole." *County of Du Page v. Ill. Labor Relations Bd.*, 900 N.E.2d 1095, 1101 (Ill. 2008). The Court may also "consider the purpose and necessity for the law, the evils sought to be remedied, and the goals to be achieved." *Andrew v. Metro. Water Reclamation Dist.*, 160 N.E.3d 895, 904 (Ill. 2019). Finally, the Court presumes that the Illinois General Assembly, "in enacting legislation, did not intend absurdity, inconvenience, or injustice." *Roberts*, 2021 WL 2460253, at *4.

In reading section 5/12.45, it appears subsections (d) and (e) work in tandem, with subsection (d) describing the effect of a corporation's reinstatement on its powers, rights, and liabilities, while subsection (e) describes the effect on the personal liability of shareholders, directors, officers, employees, and agents. *See* 805 Ill. Comp. Stat. 5/12.45(d)–(e). The statute's language also suggests that subsection (e) is meant to clarify the effects of reinstatement under subsection (d) because it explicitly states that it not meant to "limit[] the generality of subsection (d)." *Id.* § 5/12.45(e). In effect, the statute provides that when a corporation is reinstated, it will become liable for any obligations that its officers entered into on its behalf during the period of dissolution, *id.* § 5/12.45(d), and, as a result, those officers will no longer be personally liable for the obligations, *id.* § 5/12.45(e).

Since a corporation's ability to absorb liabilities under subsection (d) has a direct effect on whether an individual can be personally liable for those same liabilities under subsection (e), it is important to understand how Illinois courts interpret subsection (d). As Illinois courts have said, subsection (d) "codifies the [common-law] doctrine of 'relation back,' which permits a reinstated corporation to ratify actions taken on its behalf while it was dissolved, giving those actions legal effect from the time they were taken." *Cardem, Inc. v. Marketron Int'l, Ltd.*, 749 N.E.2d 477, 479 (Ill. App. Ct. 2001) (quoting *Chi. Title & Tr. Co. v. Brooklyn Bagel Boys, Inc.*, 584 N.E.2d 142, 146 (Ill. App. Ct. 1991)). The "relation back" doctrine does not, however, "transform individual liability to corporate liability, nor does it create a legal fiction contrary to the true nature of events." *Dep't of Revenue v. Semenek*, 551 N.E.2d 314, 315 (Ill. App. Ct. 1990) (citation omitted). This makes sense considering subsection (d) provides that, upon reinstatement, acts of the corporation's "shareholders, directors, officers, employees, and agents, *acting or purporting to act in that capacity*" will be ratified. 805 Ill. Comp. Stat. 5/12.45(d) (emphasis added). Likewise, subsection (e) only absolves personal liability "for the debts and liabilities *of the corporation*." *Id.* § 5/12.45(e) (emphasis added).

In defining the scope of the "relation back" doctrine, Illinois courts were aware of the potential for abuse, recognizing that an individual might try to "substitute worthless corporate liability for valuable personal liability." *Regal Package Liquor, Inc. v. J.R.D., Inc.*, 466 N.E.2d 409, 412 (Ill. App. Ct. 1984); *see also Henderson-Smith & Assocs., Inc. v. Nahamani Family Serv. Ctr., Inc.*, 752 N.E.2d 33, 40 (Ill. App. Ct. 2001) ("Illinois courts have understood the intent of the legislature to be that . . . parties should not be able to employ these provisions to evade otherwise legitimate debts."). Accordingly, "the reinstatement of a dissolved corporation does not 'relate back' to the time of dissolution so as to absolve the officers of personal liability

12

for debts incurred by them during the period of dissolution." *Plepel's Estate v. Indus. Metals, Inc.*, 450 N.E.2d 1244, 1246 (Ill. App. Ct. 1983). In those circumstances, the "relation back" doctrine, as codified in subsection (d), is "inapplicable" and will not absolve an officer's personal liability. *Semenek*, 551 N.E.2d at 316.

This is precisely the issue preventing Mr. Pellin from obtaining summary judgment. IHB argues that Mr. Pellin was operating as United Rail without any authority because he knew that the company had been dissolved yet he continued to conduct business with IHB under the United Rail name. Mr. Pellin's knowledge of dissolution is certainly a reasonable inference given his position at the company. *See Affiliated Capital Corp. v. Buck*, 886 F. Supp. 647, 649 (N.D. Ill. 1995) (holding a corporation's president personally liable for an amount due because he "presumably knew or at a minimum should have known" that the corporation was dissolved at the time of entering into a lease). Nearly nine years after the dissolution, it was only after this case had been filed—and presumably when Mr. Pellin's exposure to personal liability became clear—that Mr. Pellin had United Rail reinstated. It is not far-fetched to think this reinstatement was meant to obscure the true nature of events. IHB also identifies the manner in which Mr. Pellin conducted his various businesses and sold their assets, suggesting that it allowed him to retain significant proceeds from the sale while leaving United Rail and UTG with limited resources (and, of course, their creditors with little recourse). A reasonable jury could take these facts and conclude that Mr. Pellin was attempting to transfer his personal liability into largely worthless corporate liability, which is it prohibited under Illinois' version of the "relation back" doctrine. *See Regal Package*, 466 N.E.2d at 412; *see also Cardem*, 749 N.E.2d at 481 (affirming the trial court's holding that personal liability was appropriate because the individual received a

13

personal benefit by signing in the dissolved company's name and he was aware that the company had no assets and that he should not conduct business in its name).

Moreover, Mr. Pellin's own description of the events in this case raise further questions about whether he would be entitled to protection under section 5/12.45(e). He has specifically disclaimed that he ever acted on behalf of United Rail during the relevant time frame because he claims United Rail ceased operations in 2001. That story is inconsistent with what is necessary for "relation back" to work—that is, Mr. Pellin acting on behalf of United Rail while it was dissolved. The inconsistent stories also support IHB's view that the reinstatement was simply a way to shift Mr. Pellin's personal liability onto United Rail, which appears to have limited capacity to pay any outstanding charges. These factual discrepancies and the issue of Mr. Pellin's intent will need to be resolved by a jury.

In reply, Mr. Pellin argues that the decisions regarding section 5/12.45 and personal liability—e.g., *Semenek* and *Plepel's Estate*—are no longer applicable because the statute has since been revised to add subsection (e).[5] He is correct that subsection (e) clarifies how personal liability works when a corporation is reinstated following an administrative dissolution. *See Cardem*, 749 N.E.2d at 479 (recognizing, prior to the addition of subsection (e), that subsection (d) "does not expressly address the effect of a corporation's reinstatement on personal liability"). Indeed, the provision seems to undermine the previous understanding that 805 Ill. Comp. Stat. 5/3.20, 5/8.65, and 5/12.45 could be harmonized "by permitting the corporation to ratify the acts

---

[5] Subsection (e) went into effect on January 1, 2015, but neither the parties nor this Court have found a case specifically addressing the provision. Recently, in a case from the Northern District of Illinois, a court relied on *Plepel's Estate* in stating that, "[i]n Illinois, an individual owner or operator of a former corporate entity is contractually obligated for debt incurred during the time that the corporation operated while it was dissolved." *Laborers' Pension Fund v. R & W Constr. Inc.*, No. 16 C 06885, 2021 WL 1172698, at *3 (N.D. Ill. Mar. 29, 2021) (citing *Plepel's Estate*, 450 N.E.2d at 1246). However, the case did not mention subsection (e), and the plaintiff's argument in favor of personal liability was not challenged by the defendants. *Id.*

of its officers, directors and shareholders without negating the personal liability imposed on those persons who illegally carry on the business of the corporation while the corporation is dissolved." *Chi. Tile Inst. Welfare Fund v. Hermansen*, No. 94 C 7216, 1996 WL 131800, at *5 (N.D. Ill. Mar. 21, 1996); *see Chi. Title & Tr.*, 584 N.E.2d at 146 (holding that joint and severable liability for the corporation and its officers harmonizes sections 5/12.45 and 5/8.65). Rather than allowing joint liability for both a reinstated corporation and an officer, subsection (e) seems to provide that there can be no personal liability for debts incurred during dissolution, provided the corporation is reinstated and the actions are properly ratified.

With that said, it does not follow that the limits placed more broadly on the "relation back" doctrine in cases like *Plepel's Estate* and *Semenek* have also been eliminated. Those decisions specifically describe situations where "relation back" is prohibited—that is, when it would create a "legal fiction," *Semenek*, 551 N.E.2d at 315, or when it is being used to absolve an individual of "debts incurred by" that individual, *Plepel's Estate*, 450 N.E.2d at 1246. If a corporation cannot "relate back" to absorb certain liabilities under subsection (d), then an officer cannot obtain the resulting protection for personal liability offered under subsection (e). And, as already stated, the jury will need to resolve disputed facts that are relevant to whether "relation back" is proper in the first instance.

Therefore, the Court denies the Defendants' motion for summary judgment on the issue of Mr. Pellin's personal liability.

**B.    Whether the Freight Charges Should Be Suspended**

The Defendants next seek summary judgment on the $26,800 in freight charges. They state that on December 27, 2016, Mr. Pellin delivered a check to IHB in that amount, but IHB did not cash it. Relying on Indiana's version of the Uniform Commercial Code, the Defendants

argue that the delivery of that check suspended any obligation to pay those charges until the check was dishonored. That provision of the Indiana code provides, in relevant part:

> (b) Unless otherwise agreed and except as provided in subsection (a), if a note or an uncertified check is taken for an obligation, the obligation is suspended to the same extent the obligation would be discharged if an amount of money equal to the amount of the instrument were taken, and the following rules apply:
>
> > (1) In the case of an uncertified check, suspension of the obligation continues until dishonor of the check or until it is paid or certified. Payment or certification of the check results in discharge of the obligation to the extent of the amount of the check.

Ind. Code § 26-1-3.1-310(b). The Defendants argue that the obligation should be suspended because IHB has not presented the check for payment, *see id.* § 26-1-3.1-501, nor has the check been dishonored, *see id.* § 26-1-3.1-502.

While this is a facially plausible argument, the Defendants cannot avoid relevant facts affecting the suspension provision's application at this stage of the case. For starters, the check that this suspension argument is based on was void after 90 days, which occurred nearly five years ago. *See also* Ind. Code § 26-1-3.1-304(a)(2) (providing that a check that is payable on demand becomes overdue after 90 days). More importantly, Mr. Pellin admitted that he has spent most of the money in the account and that there is not enough to pay the full $26,800 in freight charges. Since the Defendants exercised ownership over that money by spending it on legal fees, they cannot turn around and get the benefit of suspending the obligation. *See Johnson v. State*, 304 N.E.2d 555, 561 (Ind. Ct. App. 1973) ("The lender's obligation could not be held to be suspended unless it has relinquished to the borrower all its property rights in the instrument itself. Retention of a property interest in the check by the lender is inconsistent with a suspension of the obligation to lend the money.");[6] *cf. Bennett v. Broderick*, 858 N.E.2d 1044, 1050 (Ind. Ct.

---

[6] *Johnson* addressed a previous version of the suspension statute which provided that, when an instrument was taken for an underlying obligation, that obligation "was suspended pro tanto until it is due or if it is

16

App. 2006) (noting that the party had sufficient funds in his bank account to honor the check); *Ind. Ins. Co. v. Margotte*, 718 N.E.2d 1226, 1230 (Ind. Ct. App. 1999) (same). Since the check is no longer able to discharge the $26,800 in freight charges, continued suspension of that obligation is not appropriate.

Furthermore, IHB's confusion about what the check represented makes it difficult to conclude, as a matter of law, that the check was accepted by IHB as payment for the freight charges. While the Defendants claim that it was merely payment for the outstanding freight charges, IHB was reasonably concerned that it was intended to cover the full outstanding balance—or, as IHB puts it, an attempted accord and satisfaction.[7] At the time of its delivery, the parties disagreed about how much was owed and Mr. Pellin had altered the aging report to state that the check was "final payment" and that the balance was zero. After Mr. Pellin delivered the check to IHB, IHB attempted to follow up about the payment in January 2017, but the record does not show that any discussion with Mr. Pellin took place. These facts indicate that there was no agreement about payment for any underlying obligation or that the check was accepted by

---

payable on demand until its presentment," or until it was dishonored. *Johnson*, 304 N.E.2d at 561 (citing Ind. Code § 26-1-3-802). While this language is slightly different from the current form, any difference does not affect the reasoning in *Johnson* and its relevance to this case. Indeed, courts often rely on these earlier cases despite the revisions to Article 3 of Indiana's commercial code. *See, e.g.*, *In re Simpson*, 474 B.R. 656, 660 n.5 (Bankr. S.D. Ind. 2012).

[7] An accord and satisfaction occurs when a party against whom claim is asserted (1) tenders a check as full satisfaction for a claim in good faith, (2) that the amount of the claim was subject to a bona fide dispute, and (3) the claim obtained payment of the instrument. *See* Ind. Code § 26-1-3.1-311(a); *see also Wolfe v. Eagle Ridge Holding Co.*, 869 N.E.2d 521, 524–27 (Ind. Ct. App. 2007); *Mominee v. King*, 629 N.E.2d 1280, 1282–83 (Ind. Ct. App. 1994). Given the parties' disagreement as to how much was owed and that Mr. Pellin modified the aging report to show this was a "final payment," it was understandable that IHB was worried about an accord and satisfaction. *See Wolfe*, 869 N.E.2d at 526–27 (holding that there was an accord and satisfaction when there was bona fide dispute, the check was tendered in good faith, the check and accompanying correspondence indicated it was a full and final payment, and the check was cashed); *Mominee*, 629 N.E.2d at 1283 (concluding that a party intended an accord and satisfaction considering the dispute about the amount of payment and a notation on the check stating "Balance on Commissions Payment in full").

17

IHB in order to discharge an obligation. *Cf. Am. States Ins. Co. v. Floyd I. Staub, Inc.*, 370 N.E.2d 989, 996 (Ind. Ct. App. 1977) (concluding that "[t]he evidence presented is sufficient to show that the note and security interest in the land were not taken in discharge of the underlying obligation"); *Associated Bank v. Larscheid*, No. A06-1557, 2007 WL 2177799, at *2 (Minn. Ct. App. July 31, 2007) ("This evidence supports a finding that the parties never agreed that the check would be taken as payment for appellant's obligation."). Since there was no agreement that IHB was taking the check as payment for the freight charges, the Defendants have not shown the prerequisite for suspension—namely, that the check was "taken *for an obligation*." *See* Ind. Code § 26-1-3.1-310(b) (emphasis added).

The only case cited by the Defendants, *Graves v. Johnson*, 862 N.E.2d 716 (Ind. Ct. App. 2007), does not support suspending the obligation to pay freight charges here. That case involved an insurance company sending checks that were payable to both the property owners and lessees following a fire. *Id.* at 717–18. After the lessees took a check without giving the owners their portion, the owners attempted to recover that payment from the insurance company. *Id.* at 718. The insurance company prevailed, in part, because "where one joint payee takes and possesses a check, it suspends all obligations as to other joint payees." *Id.* at 721. Unlike this case, there was no dispute in *Graves* about whether the payments were intended for a specific obligation. In fact, the parties in *Graves* had an agreement about how payment was going to be made for the underlying obligation. *See id.* (finding that there was no dispute that the insurance company sent the check "in accordance with the terms it set forth to the [owners] and as agreed upon by the [owners]"). Thus, *Graves* does not provide support for suspending the freight charges here, where those was no agreement that the check was being accepted for a specific obligation.

Finally, the Defendants argue that this statute merely operates like an exhaustion requirement. The Defendants reason that all IHB needs to do is tender the check and, if Defendants refuse to honor it, then IHB can bring an action for dishonor. But, as noted, this would be entirely pointless as Mr. Pellin has admitted there is not enough money in the account and the check is void. Even if administrative exhaustion was an apt comparison, exhaustion requirements in Indiana "may be excused if the exercise would be futile." *M-Plan, Inc. v. Ind. Comprehensive Health Ins. Ass'n*, 809 N.E.2d 834, 839 (Ind. 2004). Enforcing such a requirement would also be inconsistent with the statute's purpose, which, as other courts have explained, "does no more than recognize the uncertainty attendant upon an uncertified and unpaid check and suspends the obligation until that uncertainty is resolved." *Briargate at Seventeenth Ave. Owners Ass'n v. Nelson*, 494 P.3d 1149, 1156 (Colo. App. 2021) (quoting *France v. Ford Motor Credit Co.*, 913 S.W.2d 770, 772 (Ark. 1996)).[8] Once the check became void after 90 days and the Defendants spent the money, any uncertainty was resolved, and a suspension was no longer appropriate.

Accordingly, the Defendants have failed to show that summary judgment is warranted on the claim for the $26,800 in freight charges.

## CONCLUSION

For the reasons set forth above, the Court hereby DENIES the Defendants' Amended Motion for Partial Summary Judgment [ECF No. 80]. The Court will set this matter for a telephonic scheduling conference by separate order.

---

[8] The Court finds these cases helpful because both states have adopted nearly identical versions of the suspension statute at issue in this case. *See* Colo. Rev. Stat. § 4-3-310; Ark. Code Ann. § 4-3-310; *see also DiMaggio v. Rosario*, 950 N.E.2d 1272, 1275 (Ind. Ct. App. 2011) ("[W]here no Indiana cases adequately address the issues involved in a case, decisions of other jurisdictions may be instructive." (citation omitted)).

SO ORDERED on February 23, 2022.

                                              s/ Theresa L. Springmann
                                              JUDGE THERESA L. SPRINGMANN
                                              UNITED STATES DISTRICT COURT