**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | |
|---|---|
| INDIANA HARBOR BELT RAILROAD COMPANY, | |
| Plaintiff, | |
| v. | CAUSE NO.: 2:17-CV-287-TLS |
| UNITED TRANSPORTATION GROUP, INC. and MICHAEL V. PELLIN, individually and d/b/a United Rail Service Inc., | |
| Defendants. | |

**OPINION AND ORDER**

This is an action by a railroad seeking payment from a longtime customer of demurrage charges, holding charges, and freight charges incurred from July 2014 to October 2016. On July 3, 2017, the Plaintiff, Indiana Harbor Belt Railroad Company, filed a Complaint [ECF No. 1] against United Transportation Group, Inc. (United Transportation or UTG) and United Rail Service Inc. (United Rail), seeking to recover $197,150 in charges under the Interstate Commerce Commission Termination Act, 49 U.S.C. § 10101, et seq. A year later, the Plaintiff filed an Amended Complaint [ECF No. 53] on June 27, 2018, which substituted United Rail with Michael Pellin, both individually and doing business as United Rail, because United Rail had been administratively dissolved.

After receiving the parties' stipulations [ECF Nos. 95, 115], holding a bench trial from March 27, 2023, to March 31, 2023 [ECF Nos. 117–121], observing the witnesses at trial and reviewing the trial exhibits, and considering the Proposed Findings of Fact and Conclusions of

Law submitted by the parties [ECF Nos. 128, 129], the Court enters the following written findings of facts and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## LEGAL STANDARD

Rule 52(a)(1) provides that the Court in a bench trial "must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). "This means that 'there must be findings . . . which are sufficient to indicate the factual basis for the ultimate conclusion.'" *Rucker v. Higher Educ. Aids Bd.*, 669 F.2d 1179, 1183–84 (7th Cir. 1982) (quoting *Kelley v. Everglades Drainage Dist.*, 319 U.S. 415, 422 (1943)). This requirement serves a dual purpose: "(1) to provide appellate courts with a clear understanding of the basis of the trial court's decision, and (2) to aid the trial court in considering and adjudicating the facts." *Freeland v. Enodis Corp.*, 540 F.3d 721, 739 (7th Cir. 2008) (quoting *Bartsh v. Nw. Airlines, Inc.*, 831 F.2d 1297, 1304 (7th Cir. 1987)). The Court's "findings are adequate if they are sufficiently comprehensive to disclose the steps by which the trial court reached its ultimate conclusion on factual issues." *Bartsh*, 831 F.2d at 1304. "[F]indings on every issue presented in a case are unnecessary if the trial court has found such essential facts as lay a basis for the decision." *In re Lemmons & Co.*, 742 F.2d 1064, 1070 (7th Cir. 1984). "The normal standard of proof in a civil case is, of course, proof by a preponderance of the evidence." *Burdett v. Miller*, 957 F.2d 1375, 1382 (7th Cir. 1992).

## FINDINGS OF FACT

At trial, the Court heard testimony from the following witnesses (in order of testimony):

- Daniel Kelley, the Plaintiff's former assistant general superintendent;
- Michael Pellin, owner and operator of United Rail Service, Inc. and United Transportation Group;
- James Sheppard, the Plaintiff's former senior director of commercial operations;

- James Phillips, former general manager at United Rail Service, Inc. and United Transportation Group;

- Kim Guill, former administrative assistant at United Transportation Group;

- Joseph Ruff, the Plaintiff's manager of revenue, accounting, and billing;

- Leo Pauwels, the Plaintiff's director of industrial development;

- Christine Wilson, the Plaintiff's former customer service representative.

The following findings of facts are based on the parties' stipulations, admitted exhibits, and testimony elicited at trial.

### A.   Parties

### 1.   *Plaintiff Indiana Harbor Belt Railroad Company*

The Plaintiff is a common carrier by rail located in the Chicago/Northwest Indiana area and interchanges rail traffic typically flowing from the west coast to the east coast of the United States. ECF No. 95 at 3;[1] Trial Tr. vol. 1, 37. The Plaintiff is a short line railroad (Class 3) that runs short distances from two points because goods that need to go from the west coast to the east coast cannot move directly by one railroad. Trial Tr. vol. 1, 36–37. Class 1 railroads (railroads that transport over long distances) bring the rail cars to the Plaintiff. *Id*. at 50. Examples of the types of goods in the rail cars interchanged by the Plaintiff for its customers include automobiles, steel, chemicals, sand, and grain. *Id*. at 38.

By interchanging the rail traffic, the Plaintiff receives rail cars from one party. *Id*. Then either another party comes and gets those rail cars from the Plaintiff or the Plaintiff takes the rail cars to another location and the other party takes them on their railroad. *Id*. So the Plaintiff handles rail cars given to it by one railroad and turns the rail cars over to another party or location, which is "switching." *Id*. at 35, 38. The Plaintiff owns a switching yard known as the

---

[1] The Court accepted the parties' Pre-Trial Order [ECF No. 95] on March 8, 2023. *See* ECF No. 110.

"Michigan Avenue Yard" located in East Chicago, Indiana. *Id*. at 34–35. The Plaintiff's

Michigan Avenue Yard receives and switches rail cars from its tracks to its customers, holding

between eight hundred to nine hundred rail cars at a time. *Id*. at 35. Those customers are

individual facilities that receive rail cars for loading, unloading, cleaning, or other purposes. *Id*.

The Plaintiff also handles empty rail cars. *Id*. at 38–39.

The Michigan Avenue Yard supports the Plaintiff's crews that switch those rail cars and

deliver those rail cars to the Plaintiff's customers. *Id.* at 35. The Plaintiff has about thirty-five

customers sharing the use of the Plaintiff's Michigan Avenue Yard. *Id*. at 41. At any given time,

four to seven crews work the Plaintiff's yard. *Id*. at 54. The number of rail cars flowing in and

out of the Plaintiff's yard varies from day to day. *Id*. at 42. With that number "there is a large

degree of unpredictability," *id*., because "[t]he volumes fluctuate between the customers," *id*. at

49. The Plaintiff's yardmaster tells the crew which rail cars to move. *Id*. at 59. The yardmaster

reports to the trainmaster at the yard. *Id*. If the yard experiences a clog of rail cars, the

trainmaster is obligated to report it to the Plaintiff's management. *Id*. at 60.

When a rail car comes into the Plaintiff's yard, it comes in on a track with other rail cars

that are part of a train. *Id*. at 40–41. The rail cars are switched out from the train and organized

into another train, so that the Plaintiff can deliver the rail cars to its customers. *Id*. at 41. Once

the Plaintiff's customers are finished with the rail cars, those rail cars come back to the

Plaintiff's yard and are switched again. *Id*. at 42. When the rail cars are returned to the Plaintiff,

the Plaintiff requires its customers to provide a shipping document or bill stating where the rail

car needs to go next; this is because usually the rail cars do not return to the same location from

which they originated. *Id*. at 43.

2.     *Defendants United Transportation and Michael V. Pellin*

From 2002 through 2016, Defendant United Transportation—an Illinois corporation, incorporated on December 27, 1996—operated at 1150 East 145th Street, East Chicago, Indiana (the "East Chicago Facility"), which could store approximately 350 rail cars at a time. ECF Nos. 95 at 5, 115 at 1; Trial Tr. vol. 2, 287. Prior to 2002, the East Chicago Facility was operated by United Rail, which is an Illinois corporation that was incorporated on May 7, 1986, dissolved on October 9, 2009, and reinstated in 2018. ECF No. 95 at 5; Trial Tr. vol. 2, 236–37, 259; Trial Ex. 9. At the end of 2001, United Rail ceased operating the East Chicago Facility, and Defendant United Transportation took over United Rail's previous operations in 2002. Trial Tr. vol. 2, 291. Defendant Michael V. Pellin was the owner and operator of United Rail and then the owner and operator of United Transportation. ECF No. 95 at 5.

From 1989 through 2016, the Plaintiff delivered rail cars to the East Chicago Facility, ECF No. 95 at 7; Trial Tr. vol. 2, 284–85, and the Plaintiff was the only rail carrier that could bring rail cars into and out of the facility, Trial Tr. vol. 2, 285. These rail cars were empty, private "residue tank cars." Trial Tr. vol. 1, 61; vol. 2, 426. The service provided by the East Chicago Facility was the cleaning of the interior of the empty rail cars, which were then sent back to their owner or to an industry that needed any empty rail car to load with goods. Trial Tr. vol. 1, 62; vol. 2, 233, 284.

During the relevant period for this litigation—from July 2014 to October 2016, United Transportation was the only company operating the East Chicago Facility that could receive and clean rail cars. Trial Tr. vol. 2, 227–29. Also, United Transportation paid the invoices from the Plaintiff, even though the Plaintiff named United Rail as the responsible entity on the invoices. *Id*. at 229–30. United Transportation paid the Plaintiff approximately $4.1 million from 2002

through 2017 for freight (switching) charges. *Id*. at 310, 316; Trial Ex. 68. The Plaintiff's employees continued to refer to the customer as "United Rail" after United Transportation took over in 2002. Trial Tr. vol. 2, 400; vol. 3, 581; vol. 4, 725.

**B.    Demurrage Charges**

*1.    Demurrage History*

From 1989 to July 2014, the Defendants at the East Chicago Facility were charged demurrage only three to five times, and the Plaintiff credited back those charges each time. Tr. vol. 2, 291–92. James Sheppard, the Plaintiff's senior director of commercial operations—whose employment began with the Plaintiff in 1991 and ended on July 1, 2014, testified that he took an "unforeseen" early retirement on July 1, 2014, due to a heart attack. *Id*. 366–67, 372–73. He also testified that "demurrage was not a particular problem with [the Plaintiff] during [his] tenure." *Id*. at 388. He clarified that he meant that "there was no particular problem with United Rail and demurrage." *Id*. at 388–89.

Defendant Pellin testified that "there was implicit understanding the whole time we were in business [with the Plaintiff] to [the] effect" that the Plaintiff would not charge demurrage, though that arrangement changed in "March of 15" (March 2015). Tr. vol. 1, 164. Defendant Pellin's understanding (prior to March 2015, when the Plaintiff's representatives held a meeting with the Defendants' representatives, as discussed below) was that "we weren't subject to demurrage." *Id*. He stated that "demurrage didn't apply because we weren't under that system." *Id*. at 196. He explained that "[i]t was understood" that the Plaintiff was not going to charge demurrage "because we had no control of when the cars were delivered." *Id*. at 164. He emphasized that the Plaintiff "had control . . . [of] when and what was delivered." Trial Tr. vol. 2, 300.

6

James Phillips—United Transportation's general manager—also testified that the service the Plaintiff provided to United Transportation was "[h]it and miss," which meant that "[i]t would be good for two, three days and then [would] go back" to not picking up rail cars. Trial Tr. vol. 3, 448–49. He testified that "it got to the point where the older cars were being pushed back with the newer cars in front of it, and they would arrive first." *Id*. at 453. He confirmed this change happened around 2014. *Id*.

Kim Guill, United Transportation's administrative assistant, testified that in 2014, there were delays in getting rail cars delivered from the Plaintiff. Trial Tr. vol. 4, 773. She testified that "there were times when . . . we were told to order cars in, and then there were times when [the Plaintiff] would just deliver the cars that were most available for them to pull in." *Id*. at 775. Guill explained that "at one point we were able to call in cars . . . but . . . the majority of the time it was what [the Plaintiff] delivered." *Id*. at 777.

On the other hand, Christine Wilson, the Plaintiff's customer service representative, testified that "[w]e would attempt to deliver the oldest cars that were at Michigan Avenue" to the East Chicago Facility. Trial Tr. vol. 3, 507. Wilson agreed with counsel that there were situations in 2014 and 2015 when United Transportation could not accept cars for multiple days in a row because of cars already on United Transportation's lead. *Id*. at 516. Also, Defendant Pellin confirmed that the East Chicago Facility shared a lead with ICO Polymers. Trial Tr. vol. 2, 355.

2.    *Demurrage Invoices at Issue*

Trial Exhibit 63 contains the demurrage charges at issue from July 2014 to October 2016. The invoices for this period show the following charges: (1) July 2014: $64,440; (2) August 2014: $31,650; (3) September 2014: $31,590; (4) October 2014: $17,310; (5) November 2014: $1,200; (6) December 2014: $6,090; (7) January 2015: $690; (8) February 2015: $5,280;

(9) September 2015: $990; (10) October 2015: $180; (11) March 2016: $900; (12) April 2016: $330; (13) June 2016: $270; and (14) July 2016: $2,130. Trial Ex. 63. These charges total $163,050.[2] Trial Tr. vol. 4, 672; Trial Ex. 63. The Plaintiff addressed each invoice to United Rail at the East Chicago Facility address. Trial Ex. 63.

Defendant Pellin testified that he received the first invoice with demurrage charges for $64,440 in August 2014. Trial Tr. vol. 2, 293. At that time, he "was a little shocked" because "[the bill] was so outrageous." *Id*. at 300–01. Then "he tried to get ahold of . . . Jim Sheppard . . . but . . . learned Leo Pauwels was in charge, so [he] attempted to get him," and that "[t]ook a good couple weeks." *Id*. at 301. He stated that he "got [Pauwels] . . . September 7th or something and then [he] finally got ahold of him." *Id*. The Court finds that this testimony indicates that Defendant Pellin disputed the demurrage invoice.

*3.*     *The Plaintiff's Demurrage Tariff Provision*

It is undisputed that the Plaintiff assessed the demurrage charges at issue based on its demurrage tariff—Tariff 6004-A. The Plaintiff assessed the charges based on Tariff 6004-A, Item 2005, which states the following:

> **A. APPLICATION:**
> This line item applies to railway equipment, held on IHB tracks, which will move or has moved on its own wheels, as freight subject to transportation charges.
>
> **B. STORAGE DAYS WILL COMMENCE:**
> (1) Chargeable storage days will commence from, the third 0001 hours following notice of arrival and continue until car is actually placed. Inclusive of Saturdays, Sundays and holidays, railroad and privately-owned cars and other railroad and privately-owned equipment, moving on own wheels as freight at tariff rates, will be subject to a charge of $30.00 per car per day while held on IHB tracks.

---

[2] Although not addressed by the parties, the invoices for these demurrage charges total $163,050, *see* Trial Ex. 63, but the Plaintiff alleges the Defendants owe $163,450 in demurrage charges.

**C. STORAGE PLAN:**
    (1) Unless otherwise advised, charges will be assessed against the consignor, if storage delays occur at origin or enroute; or the consignee, if storage delays occur at destination.
    (2) Settlement of charges will be made on a monthly basis for all cars released from storage during each calendar month.
    (3) Two (2) free days will be allowed on each car released from storage.
    (4) Chargeable storage rate is $30.00 per day.

Trial Ex. 1, p. 12.

4.    *Demurrage Calculations*

As discussed above, Trial Exhibit 63 contains the invoices for July 2014 to October 2016 with the demurrage calculations attached to each invoice. In these calculations, the following information is shown for each rail car delivered by the Plaintiff to the Defendants' East Chicago Facility: (1) identification of each rail car by letters and numbers; (2) date of rail car's "constructive" placement;[3] (3) date of rail car's "actual" placement;[4] (4) date that the customer "released" the rail car back to the Plaintiff or sent it back to the Plaintiff; (5) number of "adjustment" days, calculated as the number of days removed (subtracted) when calculating demurrage; and (6) demurrage charge for each rail car. Trial Ex. 63; Trial Tr. vol. 4, 668–69, 704–5. The parties stipulated that Trial Exhibit 63 correctly identifies the following: (1) the railcars, (2) the dates those railcars arrived at Plaintiff's Michigan Avenue yard, and (3) the dates those railcars were delivered to the East Chicago Facility. ECF No. 115 at 1.

The Court finds that these calculations, however, are missing some key data points. Although Leo Pauwels, the Plaintiff's director of industrial development as of July 2014, testified that the Plaintiff charged demurrage when the customer did not "order" in the rail car for

---

[3] Tariff 6004-A, Item 200, defines "constructive placement" as "[w]hen a car cannot be actually placed because of any condition attributable to the consignor or consignee, such car will be held at an available hold point and notice will be given that the car is held awaiting instructions." Trial Ex. 1, p. 4.
[4] Tariff 6004-A, Item 200, defines "actual placement" as "[w]hen a car is placed in an accessible position for loading or unloading or at a point designated by consignor or consignee." *Id.*

delivery after receiving the arrival notice, Trial Tr. vol. 4, 698, the calculations do not include a data point for the date the customer ordered the rail car or for the number of days between when the customer ordered the rail car and when the Plaintiff delivered the rail car. Also, Daniel Kelley, the Plaintiff's assistant general superintendent, testified that the Plaintiff gave its customer a "credit" when the Plaintiff delivered a newly arrived rail car instead of a rail car that had been sitting in the Plaintiff's yard for longer. Trial Tr. vol. 1, 84. However, the calculations do not include a specific data point for these "credit" days, and it is unclear from the record what method the Plaintiff used to calculate such credit days.

The record is also devoid of other documentation to support the demurrage calculations. Wilson testified that when she imputed information in the computer to show delivery of a certain rail car to the industry, the demurrage would stop on that date. Trial Tr. vol. 3, 508. Pauwels testified that after the computer calculates the demurrage charges, the demurrage manager adjusts the charges where appropriate. Trial Tr. vol. 4, 666. He confirmed that there was an adjustment of $101,760 during the time the Plaintiff assessed the charges at issue, which totals 38.37 percent of the total originally assessed. *Id*. at 724. However, the data and the method used by the manager to calculate the adjustments is absent from the record, and the demurrage manager did not testify at trial. Also, the identification of the party that detained the rail cars and the reason for the detention is not included in the calculations. Pauwels testified that the Plaintiff did not maintain such records, as they were "somewhat fragile," meaning "not kept for a long time." Trial Tr. vol. 4, 749. He explained that obtaining such information would require speaking to the Plaintiff's yard crew to find out what happened. *Id*. at 749–50. None of the Plaintiff's yard crew testified at trial. Pauwels also explained that if a customer saw an error for a demurrage charge on its bill, the customer could dispute it with proof of the error. *Id*. at 671.

Trial Exhibit 64 contains all the arrival notices provided to the Defendants on each day one or more rail cars arrived at the Plaintiff's Michigan Avenue Yard for delivery to the Defendants' East Chicago Facility. These daily arrival notices list each rail car that incurred the demurrage charges at issue and the other rail cars that did not. Trial Tr. vol. 4, 666. For each arrival notice, the following information is shown: (1) letters and numbers identifying each rail car and (2) the date of arrival at the Plaintiff's Michigan Avenue Yard.[5] Also, each arrival notice states, "You are hereby notified that the following cars consigned to you have arrived and cannot [be] delivered [on] account of your inability to receive them." *Id*. However, Pauwels testified that this was "just a notice . . . put into a one-size-fits-all form" but it does not mean all rail cars on the arrival notice could not be placed. Trial Tr. vol. 4, 741–42. The date of the arrival notice for each rail car, which are found in Trial Ex. 64, corresponds with the constructive placement date included in the demurrage calculations attached to the invoices in Trial Ex. 63. *See* Trial Tr. vol. 4, 705. The daily arrival notice also contains the total number of rail cars that arrived on the arrival notice's date at the Plaintiff's yard destined for the Defendants' East Chicago Facility. *Id*. at 711; Trial Ex. 64. The parties stipulated that the arrival notices correctly identify the railcars and the dates those railcars arrived at Plaintiff's Michigan Avenue yard. ECF No. 115 at 1.

5. *Pauwels' Testimony Regarding Demurrage Charges*

Pauwels testified that the Plaintiff verified the accuracy of its invoices. *Id*. at 684. Pauwels stated that the demurrage charges, which were ultimately assessed after adjustments, were assessed because the Defendants' East Chicago Facility was unable to receive the rail cars

---

[5] Although not addressed by the parties, the Court recognizes that the daily arrival notices also list the following information for each rail car: (1) weight as "empty"; (2) rail car's geographic origin point; (3) carrier that delivered each rail car to the Plaintiff; (4) rail car's "waybill" number; and (5) shipper. Trial Ex. 64. None of the shippers listed are a party to this lawsuit. *See id*. The Court also notes that the referenced "waybill" for each rail car does not appear to be contained in the record because there is nothing in the record that connects the rail cars at issue to waybills.

at issue. *Id*. He confirmed that the Plaintiff made an "effort" to deliver the oldest rail cars first. *Id*. at 660. However, he also confirmed that the Plaintiff really had no incentive to provide customers with rail cars as quickly as possible. *Id*. at 683.

Referencing Trial Exhibit 64, Pauwels testified that it would not have been possible to have delivered to the Defendants the forty-two rail cars that arrived at the Plaintiff's yard on August 11, 2014. Trial Tr. vol. 4, 652–53. He testified that on September 21, 2015, it also would not have been possible to deliver the fifty-four cars that arrived. *Id*. at 653. He agreed with counsel that the reason the Plaintiff could not deliver the fifty-four rail cars was due to the amount of room on the Defendants' East Chicago Facility's lead. *Id*.[6] Pauwels also agreed with counsel that it would have been possible for Guill to look at the arrival notices to determine the oldest rail cars available to her and request those cars be delivered to the Defendants first. *Id*. at 659.[7]

On cross-examination and referencing Trial Exhibits 63 and 64, Pauwels testified that the Defendants' East Chicago Facility's lead could handle the average number of rail cars that arrived at the Plaintiff's yard when the Plaintiff charged demurrage against certain rail cars. Specifically, Pauwels confirmed that on the arrival notice labeled IHB UTG 531, there were two demurrage charges for $1,770. *Id*. at 684–85 (referencing Trial Ex. 63, p. 3). He also confirmed that meant fifty-nine days of demurrage were charged ($1,770 divided by $30 per day). *Id*. at 685. He confirmed that the two rail cars associated with those charges were GATX73111 and GATX7184 and that the Plaintiff's invoice showed the rail cars arrived at its Michigan City Yard

---

[6] Kelley testified that the East Chicago Facility's lead could hold eighteen to twenty rail cars. Trial Tr. vol. 1, 80. He stated that twenty rail cars was the maximum that the East Chicago Facility's lead could hand at a time (depending on the size of the rail cars). *Id*.

[7] However, Wilson testified, "I know that I tried to give [Guill] the oldest cars in the serving yard, and she was *occasionally* allowed to call in a specific car." Trial Tr. vol. 3, 554 (emphasis added).

on May 13, 2014. *Id*. He then confirmed those rail cars were actually placed at the East Chicago

Facility on July 12, 2014. *Id*. at 685–86. In looking for those rail cars in the arrival notices in

Trial Exhibit 64, he agreed with counsel that May 12, 2014, was the date of arrival notice for

those rail cars. *Id*. at 689–90. He agreed that according to the arrival notice, only those two cars

arrived on that day—May 12, 2014. *Id.* at 690. He also agreed that those rail cars then sat at the

Plaintiff's yard for fifty-nine days. *Id*. Pauwels testified that the lead at the Defendant's East

Chicago Facility was big enough to accept two cars. *Id*.

Counsel then asked Pauwels to turn to the March 2014 arrival notices. *Id*. at 691

(referencing Trial Exhibit 64, IHB UTG 057). Pauwels confirmed that the March 2014 arrival

notices showed the arrival of eighty-six rail cars destined for the East Chicago Facility, which

was an average of 2.77 rail cars per day, and that the lead at the East Chicago Facility was big

enough to receive three rail cars. *Id*. at 694. For April 2014, Pauwels confirmed that the arrival

notices showed the arrival of fifty-one cars, which was an average of 1.7 rail cars per day, and

that the East Chicago Facility's lead was big enough to receive two rail cars. *Id*. at 696–97. For

May 2014, Pauwels confirmed that the arrival notices showed seventy-three rail cars, which was

an average of 2.43 rail cars per day, and the East Chicago Facility's lead was big enough for

three rail cars. *Id*. at 697–98. Returning to the two rail cars that arrived on May 12, 2014, but

were not delivered until July 12, 2014—rail cars GATX73111 and GATX7184, Pauwels testified

as to no firsthand knowledge of why the two rail cars were not delivered for fifty-nine days. *Id*.

at 698–99. In reference to the arrival notice for those two cars, Pauwels said there did not appear

to be adjustment days for those demurrage charges. *Id*. at 700 (citing Trial Ex. 63, p. 3). Pauwels

gave various possible reasons for the rail cars sitting for fifty-nine days, including that they may

not have been ordered in, there may have been rail car congestion from prior months, they may

have been left out on the lead that were never pulled in, the track may have been out of service, or NIPSCO may have been working on the power lines. *Id.* at 698. He testified that he did not know the reason because he did not go out there every day. *Id*.

Pauwels also testified that for several other cars, he did not have firsthand knowledge as to the reason they were not delivered to the East Chicago Facility. *Id*. at 700–02 (PROX77077: $2,550 demurrage charge, 85 days, arrived April 21, 2014, delivered July 17, 2014), 702–07 (PROX70387: $2,130 demurrage charge, 71 days, arrived May 5, 2014, five other rail cars also arrived that day, delivered July 17, 2014), 707–08 (TILX291162: $2,070 demurrage charge, 69 days, arrived May 8, 2014, one other rail car arrived that day, delivered July 17, 2014), 708–10 (GATX96273: $1,890 demurrage charge, 63 days, arrived May 13, 2014, one other rail car arrived that day, delivered July 17, 2014).

Pauwels testified that he was not aware of any demurrage charges assessed against the East Chicago Facility from January through June 2014. *Id*. at 712. He confirmed that, based on Trial Exhibit 63, there were 130 outbound cars in October 2014 with only $180 demurrage for that month. *Id*. at 720–21. He also confirmed that from February 2015 to September 2015, the Plaintiff did not assess any demurrage charges against the Defendants, as there are no invoices in the record for those months. *Id*. at 722–23.

6.   *The March 24, 2015 Meeting*

On March 24, 2015, Daniel Kelley, the Plaintiff's assistant general superintendent, and Tammy Winterfeldt, the Plaintiff's customer service manager, held a meeting with Guill, Phillips, and Defendant Pellin, all of United Transportation. Trial Tr. vol. 1, 78; vol. 2, 304. Kelley testified that his intent for holding the meeting was "to establish open communication and to find a solution to the cars dwelling in Michigan Avenue yard." Trial Tr. vol. 1, 83. He also

testified that he wanted "to come to an agreement on interchange processes . . . [so] that we could interchange cars in a safe and efficient manner and thereby avoid demurrage in its entirety." *Id*. at 110.

Defendant Pellin testified that it was decided at the meeting that "[United Transportation was] going to be required to call in cars, which is an abrupt change from before, when [United Transportation was] prohibited from calling in cars." Trial Tr. vol. 2, 305. He explained there was also going to be "some kind of credit . . . for the time we call in cars and they're not delivered." *Id*. at 309. Defendant Pellin described this as a "whole new system," *id*. at 306, because prior to the March 24, 2015 meeting, "[the Plaintiff] had control . . . [over] when and what was delivered," *id*. at 300. He explained, "We were at [the Plaintiff's] mercy whenever they decided to [deliver]." *Id*. If United Transportation asked for a particular car, the Plaintiff's representative could, and often did, say no. *Id*. at 306. Defendant Pellin explained that "this was just a problem we had . . . to live with for years." *Id*. at 300. The Court finds that the fact that only 2.94% of the total demurrage charges (totaling $4,800) occurred after March 2015, *see* Trial Tr. vol. 4, 737; Trial Ex. 63, bolsters the credibility of Defendant Pellin's testimony that the Plaintiff controlled delivery prior to the meeting, as does the fact that rail car delivery volume to the East Chicago Facility increased in 2015 over the prior two years yet the demurrage charges were low, *see* Trial Tr. vol. 1, 87 (2013: 763 cars delivered; 2014: 1,086 cars delivered; 2015: 1,287 cars delivered).

**C.     Holding Charges**

*1.     Invoices at Issue for Holding Charges*

Trial Exhibit 65 includes three invoices for holding charges for March 2015 and one invoice each for May 2015, July 2015, and November 2015. The invoices show the following

holding charges: (1) March 2015: $700; $500; $350; (2) May 2015: $2,800; (3) July 2015: $1,500; and (4) November 2015: $1,050. In support of these charges, the invoices each contain the following information: (1) identification of each rail car by letters and numbers; (2) the rail car's arrival date; (2) "Dispo. Date"; (3) hold charge; (4) demurrage days; (5) demurrage charge; (6) total holding charge for each rail car; and (7) at the bottom, the combined total for holding charges for all the rail cars listed on the invoice. Trial Ex. 65. The Plaintiff addressed each invoice to United Rail at the East Chicago Facility address. *Id*. These charges total $6,900. *Id*.;[8] Trial Tr. vol. 3, 619–20. The record does not contain a definition or explanation for the "Dispo. Date" category.

2.    *Documentation Attached to the Holding Charge Invoices*

Trial Exhibit 65 contains attachments to each invoice with supporting documentation. These attachments show the following information connected to each holding charge invoice: (1) identification of each rail car by letters and numbers; (2) designation of "Load/Empty"; (3) rail car arrival date and time; (4) the date and time "Dispo Rec'd"; (5) number of days without billing; (6) amount charged per rail car; and (7) at the bottom, the total balance due. Trial Ex. 65. All but the March 2015 invoice for $700 contain a notation with the date that "Kim Guill" or "Kim" was notified. *See id*. The parties stipulated that Trial Exhibit 65 correctly identifies the following: (1) the rail car, (2) the dates those railcars were picked up from the East Chicago Facility, and (3) the dates on which they departed from the Plaintiff's yard. ECF No. 115 at 2.

Although Wilson testified, "I would communicate with Kim Guill at United Rail by sending her an email saying these cars were holding, I needed billing on them," Trial Tr. vol. 3,

---

[8] Although Trial Exhibit 65 contains some of the holding charge invoices in duplicate, the Plaintiff did not include the duplicates in the total holding charges that it alleges the Defendants owe.

520, the record does not contain evidence of the date and time that the Plaintiff received the proper shipping (billing) papers from the Defendants. This data point is critical for calculating the holding charges because the Plaintiff did not assess the holding charge until 10 a.m. on the day after notification to the customer that proper shipping papers were required. Trial Tr. vol. 2, 384–85. Although the supporting documentation includes a "Dispo." date and time, it is not clear from the record what this data point represents and, therefore, whether it relates to the date and time that the Plaintiff received the proper shipping papers. As a result, the Court is unable to determine whether the Plaintiff correctly assessed the holding charges.

3.      *The Plaintiff's Holding Charges Tariff Provision*

It is undisputed that the Plaintiff assessed the holding charges at issue based on its local freight tariff—Tariff 9347-H. The Plaintiff assessed the charges based on Tariff 9347-H, Item 240, which states:

> **ITEM 240 – CARS HELD FOR ORDERS**
>
> Loaded cars, or empty cars moving on tariff, contract, or exempt quote ordered from industries without final shipping directions or shipping directions with incorrect, incomplete or conflicting instructions, will be subject to charge of RB **240** per car and demurrage charges as named in Tariff STB IHB 6004.

Trial Ex. 2, p. 8. Tariff 9437-H, Supplement 1, provides that RB 240 is $250 per car. *Id*. at Supplement 1, p. 3.[9]

4.      *Sheppard's Testimony Regarding Holding Charges*

As to the Plaintiff's Tariff 9347-H, Sheppard made clear that it "is a local freight tariff

---

[9] Tariff 9347-H, Item 240 specifies that rail cars held for improper shipping directions will be charged demurrage under "Tariff STB IHB 6004," *id.* at 8, and Sheppard testified the Plaintiff charged demurrage connected to the holding charges under Demurrage Tariff 6004, Trial Tr. vol. 2, 385. However, only Tariff 6004-A is contained in the record, not the referenced Tariff 6004.

charge." Trial Tr. vol. 2, 381. Tariff 9347-H "is for the movement of traffic on the [the Plaintiff's

railroad]." *Id*. He explained that Tariff 9347-H, Item 240 was intended to address "cars held for

orders" and that the tariff pertains to customers furnishing shipping instructions or directions

prior to the Plaintiff receiving the rail cars for shipping. *Id*. at 382. He stated, "The reason for the

shipping instructions is for the [the Plaintiff] to know how to switch the car, where the ultimate

destination is, whether to another industry or a railroad, so we can keep the car moving." *Id*.

Sheppard explained that the charge for not including proper shipping instructions is given

in the Tariff 9347-H's Supplement 1 as $250. *Id*. at 383. Sheppard also explained that a customer

would not incur the $250 charge if the customer provided the proper shipping instructions by

10:00 a.m. on the morning following notification by the Plaintiff that it needed the instructions.

*Id*. at 384–85. He agreed with counsel that if the proper bill was not received by the Plaintiff by

10:00 a.m. (on the day following notice), then the Plaintiff assessed the $250 holding charge. *Id*.

at 385.

## D.     Freight Charges

Defendant Pellin explained that the freight charges were for a switching fee, which is a

fee charged by a short line railroad for moving rail cars to private industry each time the rail car

goes in and out of a customer's facility. Trial Tr. vol. 2, 288. Joseph Ruff, the Plaintiff's manager

of revenue, accounting, and billing, testified that he prepared an aging report on November 10,

2016, that listed all of "United Rail's" outstanding invoices for all types of charges. Trial Tr. vol.

3, 577–78; Trial Exs. 51, 52. The November 10, 2016 aging report listed the total that "United

Rail" owed for all charges as $255,240. Trial Ex. 51. According to Ruff, he was then asked at the

end of December 2016 to prepare an aging report that only reflected what United Rail owed for

freight charges, which he did. Trial Tr. vol. 3, 578; *see* Trial Ex. 53. On December 25, 2016,

Defendant Pellin delivered to the Plaintiff both a check from United Transportation for $26,800 and a copy of the December 2016 aging report for the freight charges, which he modified to show an initial balance of $37,900 less credits he calculated totaling $11,100, for a balance due of $26,800 and with the words "Final Payment Dated 12-25-16" typed on the report. Trial Tr. vol. 2, 324; Trial Tr. vol. 3, 623; Trial Ex. 53; ECF No. 95 at 9. Defendant Pellin intended the $26,800 check to be a final payment to equal a zero balance. Trial Tr. vol. 2, 344–45.

Pauwels testified that he remembered a "handwritten note . . . on the aging report" indicating "payment in full." Trial Tr. vol. 3, 622–24. The Court finds that, although there is an aging report with the *typed* notation "Final Payment" as shown in Trial Exhibit 53, the record does not contain an aging report with a "handwritten note" indicating "payment in full." Thus, on this record, the "Final Payment" notation was typed.

Pauwels testified that he took the report with Defendant Pellin's notation to the Plaintiff's accounting and legal departments because he was concerned about the notation's effect on the Plaintiff's collection rights as to the other charges. *Id*. at 624. The Plaintiff did not cash the $26,800 check. Trial Tr. vol. 2, 327–28; vol. 3, 580–81, 624. Defendant Pellin admitted that the Plaintiff was owed the $26,800 in freight charges. Trial Tr. vol. 2, 346.

## CONCLUSIONS OF LAW

### A.    Demurrage Charges

The Plaintiff claims that the Defendants owe $163,450 in demurrage charges. "Demurrage is a charge that rail carriers are statutorily required to impose when rail cars are detained beyond the time the tariff allows for loading or unloading." *Wis. Cent. Ltd. v. TiEnergy, LLC*, 894 F.3d 851, 853 (7th Cir. 2018); *see* 49 U.S.C. § 10746 ("A rail carrier providing

transportation subject to the jurisdiction of the Board under this part shall compute demurrage charges, and establish rules related to those charges . . . .").

The Seventh Circuit has held that "[l]iability for freight charges may be imposed *only* against a consignor, consignee, or owner of the property, or others by statute, contract, or prevailing custom." *Ill. Cent. R.R. Co. v. S. Tec Dev. Warehouse, Inc*., 337 F.3d 813, 820 (7th Cir. 2003) (emphasis added) (quoting *Evans Prods. Co. v. I.C.C.*, 729 F.2d 1107, 1113 (7th Cir. 1984)). The Seventh Circuit considers liability for demurrage charges under the liability standard for freight charges. *See id.* ("[T]he case law supports imposition of liability against South Tec [for demurrage charges] only [if it is] . . . 'a consignor, consignee, or owner of the property, or others by statute, contract, or prevailing custom.'" (quoting *Evans Prods. Co.*, 729 F.2d at 1113)); *TiEnergy, LLC*, 894 F.3d at 856 (relying on the *South Tec* summary of the circumstances for freight charges liability to support demurrage liability for a consignee). The Seventh Circuit therefore requires that a railroad plaintiff establish a legal basis for demurrage liability. *See TiEnergy, LLC*, 894 F.3d at 856; *S. Tec Dev. Warehouse, Inc*., 337 F.3d at 820; *Evans Prods. Co*., 729 F.2d at 1113.

Specifically, although a repair facility may receive rail cars as freight and ship the rail cars out again, the repair facility or, as in this case, the cleaning facility, is not liable for demurrage as a "consignor" or "consignee" of the rail cars unless the railroad shows that "the delivery of the cars as freight is [] completed and the carrier's lien is [] extinguished when the repair facility receives the car." *Evans Prods. Co*., 729 F.2d at 1113. This is because repair facilities (or cleaning facilities) that receive rail cars as freight "do not determine the further disposition of the cars" and instead "act at the behest of the car owners/lessors." *Id.*[10]  Also,

---

[10] The Court recognizes that the Seventh Circuit also defines a "consignee" under 49 U.S.C. § 10743 as requiring "more than mere custody of the freight" when the freight is the goods that the rail cars carry.

when a party, such as the Defendants at the East Chicago Facility, receives rail cars as freight to repair the rail cars, or, as in this case, to clean the rail cars' interiors, the party may not be charged demurrage as an "owner of the property" unless the railroad shows that the receiving party owns the rail cars. *See id.* ("Repair facilities do not own the cars they repair and may not be assessed freight charges as owners.").

For liability of "others" by "statute," the railroad must show that the charged party meets the requirements of "any applicable statute holding non-consignees responsible for demurrage charges." *S. Tec Dev. Warehouse, Inc.*, 337 F.3d at 820; *see also Norfolk S. Ry. Co. v. Groves*, 586 F.3d 1273, 1278 (11th Cir. 2009) (noting that the railroad had not identified an "applicable statute that would hold non-parties to a shipping contract liable for demurrage").

For liability of "others" by "contract," "[t]he adjudicated cases do not require that there be a specific contract to pay demurrage but it must arise out of contract and in practically every instance the obligation is only enforced upon persons who are parties to the contract of carriage." *Middle Atl. Conf. v. United States*, 353 F. Supp. 1109, 1118 (D.D.C. 1972); *see Evans Prods. Co.*, 729 F.2d at 1113 ("[R]epair facilities have not contracted to assume liability for [freight]

---

*TiEnergy, LLC*, 894 F.3d at 856. Factors courts consider when determining whether a party is a "consignee" of goods include: "whether the party agreed by contract to consignee status, whether the party was designated as consignee in the bill of lading, and the nature of the party's relationship to the freight." *Id.* (citing *S. Tec Dev. Warehouse, Inc.*, 337 F.3d at 820–22). However, this definition is inapplicable because the freight in this case is the rail cars themselves. Even if the Plaintiff had timely raised the issue of whether the Defendants were a consignee under this definition and even if this definition applied when the freight is the rail car itself, at most, the Plaintiff has shown United Transportation's "custody" of the rail cars at issue because the parties stipulated that the East Chicago Facility received the rail cars and because United Transportation was operating the facility during the relevant time period of 2014 through 2016. But the record is devoid of any indication that the Defendants agreed by contract to consignee status, of the bills of lading for the rail cars that the Plaintiff assessed the demurrage charges against, and of any indication that the Defendants owned or had a property interest in the rail cars at issue. Mere custody of the rail cars is insufficient for "consignee" status whether the freight is the goods carried by the rail cars or the freight is the rail car itself.

charges. The transportation contract is for shipment of goods, here the car itself, and is between the shipper, here the car owner/lessor, and the carrier.").

When the defendant is not a party to the contract of carriage, some courts have found an exception to the contract requirement that allows a railroad to establish liability based on evidence of a non-consignee agent's intent to assume contractual liability for demurrage charges. *See Union Pac. R. Co. v. Ametek, Inc*., 104 F.3d 558, 563–64 (3d Cir. 1997) (finding "no error in the district court's finding of fact that Ametek and Panther Valley never entered into a contract binding Ametek to the payment of demurrage fees" when "[t]here [was] no evidence that Ametek intended to assume contractual liability for the demurrage charges"). Although dicta, the Seventh Circuit in *South Tec Development Warehouse, Inc.* cites *Ametek* for the contractual "assumption of liability" standard for non-consignee agents. 337 F.3d at 820 (citing *Ametek*, 104 F.3d at 563). In remanding for further consideration by the district court as to who was the legal consignee of the shipments in question, including potentially the defendant, the Seventh Circuit suggested that the district court may also consider whether the defendant had contractually assumed responsibility for the demurrage charges even though the record currently showed no such assumption. *Id*. at 822. This Court notes that in that case the demurrage charges were assessed under the railroad's demurrage tariff and that the defendant warehouse received the rail cars—that the railroad assessed the demurrage against—for unloading. *Id.* at 815, 822.

For liability of "others" by "prevailing custom," the railroad must show that an "industry-wide custom permits such a practice" of holding a receiver of empty rail cars as freight for interior cleaning liable for demurrage charges. *Id*. at 820; *Groves*, 586 F.3d at 1278 (finding that the railroad "ha[d] not offered any evidence of prevailing industry custom . . . that would hold non-parties to a shipping contract liable for demurrage").

Here, the Plaintiff has not asserted any of these bases for the Defendants' liability for demurrage articulated by the courts in *Evans Products* and *South Tec Development Warehouse*— "consignor, consignee, or owner of the property, or others by statute, contract, or prevailing custom."[11] Instead, in closing arguments, the Plaintiff argues that its demurrage tariff along with the Defendants' performance by receipt of the rail cars for cleaning was sufficient to establish demurrage liability. In their closing arguments and in their Proposed Conclusions of Law, the Defendants argue that, because the Plaintiff had not met its burden to show that it was the Defendants who detained the rail cars at issue, the Defendants are not liable for demurrage.[12] The Plaintiff responds in its Proposed Conclusions of Law by attempting to shift the burden to the Defendants to show that the Defendants did not detain rail cars at issue. In its Proposed Conclusions of Law, the Plaintiff also appears to argue that its demurrage tariff is a basis for liability under 49 C.F.R. § 1333.2.

---

[11] The Court recognizes that the Plaintiff, for the first time in its Proposed Findings of Fact and Conclusions of Law, labels the Defendants as a "consignee" and asserts that they are presumptively liable for the demurrage charges under 49 U.S.C. § 10743. This theory of liability was not in the Amended Complaint, the Pre-Trial Order, or closing arguments, and the record does not show that the Defendants consented to the Plaintiff trying this issue. *See* Fed. R. Civ. P. 15(b)(2). Also, the Plaintiff does not acknowledge that it is raising a new theory of liability in its post-trial brief. Furthermore, the Plaintiff does not cite the Seventh Circuit's definitions for consignee. *See S. Tec Dev. Warehouse, Inc.*, 337 F.3d at 820–21 (defining consignee and highlighting that when a railroad asserts liability for demurrage charges against a consignee, the district court's role is to consider the party's "consignee status"); *Evans Prods. Co.*, 729 F.2d at 1113 (defining a consignee when the freight is the rail car itself). Even still, the shipping documents that the Plaintiff references as supporting evidence do not list United Rail or any other party to this lawsuit as the consignee but instead list other entities. Also, there is nothing in the record connecting the shipping documents to the rail cars that the Plaintiff assessed demurrage charges against. For these reasons, the Court concludes that the Plaintiff has not shown that the Defendants have "consignee" status in this case.

[12] The Court recognizes that the Defendants state that United Transportation is the consignee, in their Proposed Findings of Fact and Conclusions of Law (in the Conclusions of Law section). However, upon reading the document in its entirety, the Court concludes that this is not a judicial admission that United Transportation is a legal consignee because the statement was made in the context of United Transportation distinguishing itself from United Rail as the one that received the rail cars at issue and because there was no reference to the legal definition of consignee. At most, this shows the parties do not dispute that at least United Transportation received the rail cars at issue.

The Court first addresses the Plaintiff's argument asserting the Defendants' liability for demurrage based on the Plaintiff's tariff and the Defendants' burden on the issue of detention and then considers the Plaintiff's argument for liability under Section 1333.2.

1.    *Demurrage Tariff and Detention*

In closing arguments, the Plaintiff argued that the Defendants are liable for demurrage based on the Plaintiff's demurrage tariff.[13] In their Proposed Conclusions of Law, the Plaintiff cites two cases, first citing *Scandrett v. Worden-Allen Co.*, 299 N.W. 52, 56 (Wis. 1941), for its statement that tariffs are binding as contracts. However, the court's holding that the defendant was liable for demurrage was not based on the fact that the tariff was a contract but rather was based on a determination of whether it was the defendant that had detained the rail cars. The court determined that even though there was a strike by some employees at the defendant's facility, the defendant detained the rail cars at issue and thus was liable for demurrage under the railroad's tariff. *Id.* at 55–56. Therefore, that case supports the proposition that detention of the rail cars is a prerequisite for imposing demurrage liability on a party. *See id.* at 55–56; *see, e.g.*, *TiEnergy, LLC*, 894 F.3d at 853 ("Demurrage is a charge that rail carriers are statutorily required to impose when rail cars are *detained* beyond the time the tariff allows for loading or unloading." (emphasis added)). With the detention of the rail cars by the defendant established, the *Scandrett* court explained that "[t]he important thing is that under the tariffs there could be no release from demurrage charges until the empty cars were released to the railroad . . . [because] [t]his established the right to demurrage under tariffs which are binding . . . as contracts." 299 N.W. at

---

[13] The parties stipulated that "United Transportation Group, Inc. is *generally obligated* to pay the rates and charges published in the governing tariffs relating to rail transportation services." ECF No. 95 at 7 (emphasis added). Because of the disputes regarding the legal basis of the Defendants' liability for demurrage, whether the Defendants detained the railcars, and which party carries the burden of proving detention, the Court does not construe this stipulation to mean that the parties stipulate to United Transportation's liability under the Plaintiff's demurrage tariff.

24

56. However, the instant case is distinguishable from *Scandrett* because the Plaintiff has failed to show that the Defendants detained the rail cars at issue.

Specifically, in this case, the evidence at trial instead largely supports the conclusion that the Plaintiff detained the rail cars at issue. First, it is undisputed that the rail cars that incurred the demurrage charges were all in the Plaintiff's custody when the charges were incurred, as the rail cars were at the Plaintiff's Michigan Avenue Yard at that time. Also, the record shows there were no demurrage charges for the twenty-five years that the Plaintiff did business with the Defendants at their East Chicago Facility prior to the charges at issue in this case beginning in 2014, and the testimony of Sheppard (the Plaintiff's senior director of commercial operations) established that during those twenty-five years there was "not a particular problem" with demurrage. Plus, it is undisputed that Sheppard unexpectedly retired from working for the Plaintiff on July 1, 2014, due to a heart attack, and it is undisputed that the highest month of demurrage charges was during the first month following Sheppard's retirement—July 2014.

It is also undisputed, based on the testimony of Pauwels (the Plaintiff's director of industrial development), that the Plaintiff did not keep records of the reason for rail car detention and that such information required the firsthand knowledge of the crew that delivered the rail car, none of whom testified at trial. Pauwels' testimony also established that there were several months in which the Plaintiff assessed demurrage charges but the Defendants' East Chicago Facility's lead could have accommodated the daily average number of rail cars that arrived for delivery. Pauwels' testimony further shows that the Plaintiff did not always deliver the rail cars in the order of arrival into the Plaintiff's railyard, and he testified that the Plaintiff had no incentive to do so. Moreover, Pauwels' testimony established that the Plaintiff's computer automatically

calculated demurrage charges based on the arrival date and delivery date and that, if there was an error, the Plaintiff's demurrage manager had to catch it and manually make the correction.

Furthermore, although there is conflicting testimony on whether the Plaintiff would allow the Defendants' East Chicago Facility to call in rail cars for delivery prior to March 24, 2015, the Court finds credible Defendant Pellin's testimony that, until March 24, 2015, the Plaintiff controlled the order of rail car delivery out of its railyard and to the East Chicago Facility. Additionally, the Court finds credible the testimony of Defendant Pellin that after the March 24, 2015 meeting between Defendant Pellin and the Plaintiff's representatives, the Plaintiff began requiring the East Chicago Facility to call in the rail cars for delivery. The Court concludes that these facts establish that it was only after March 24, 2015, that the Defendants' East Chicago Facility had the responsibility for determining the order the rail cars were delivered. The record shows that after March 24, 2015, only approximately 3% of the total demurrage charges in this case were incurred yet rail car volume to the East Chicago Facility increased. These facts taken as a whole support the inference that the Plaintiff detained the rail cars at issue.

The Plaintiff does not point to any direct evidence that shows the Defendants detained the rail cars at issue. Based on its own receipt of the evidence at trial, the Court notes Pauwels' testimony that on two dates more rail cars arrived at the Plaintiff's yard than the East Chicago Facility's lead could handle. However, there was no testimony on how many rail cars the lead could handle during the additional two days of "free time" allowed for in the Plaintiff's demurrage tariff, and no explanation was given for why the number of rail cars that the lead *could* handle were not delivered. Also, Wilson (the Plaintiff's customer service representative) testified to situations in 2014 and 2015 when United Transportation could not accept cars for multiple days in a row because of cars on the lead. Additionally, Kelley (the Plaintiff's assistant

general superintendent) testified that rail car volume to the Defendants' East Chicago Facility increased from 2013 to 2016. Further, the record shows that the Plaintiff made an adjustment of $101,760 to the demurrage charges, during the time the Plaintiff assessed the demurrage charges at issue. Finally, the Plaintiff pointed out that the Defendants did not report the demurrage charges to the Surface Transportation Board (STB) and that the Defendants' East Chicago Facility shared its lead with another business, ICO Polymers. However, any contrary inference from this evidence is outweighed by the evidence that supports the inference that the Plaintiff detained the rail cars. Accordingly, the Court concludes that the Plaintiff has not proven that the Defendants detained the rail cars for which demurrage was charged. As a result, the Plaintiff's citation to *Scandrett* is not persuasive because, although generally a tariff is a contract, without detention by the party receiving the rail cars and a legal basis for liability, there cannot be liability for demurrage based on the existence of the tariff alone.

Second, the Plaintiff relies on *Union Pacific Railroad Co. v. Bartlett & Co., Grain*, 393 F. Supp. 1347, 1353 (W.D. Mo. 1975), to support shifting the burden to Defendants to show that they did not detain the rail cars. In that case, a railroad sought to recover demurrage from a consignee—a grain facility receiving the rail cars loaded with grain for unloading; thus, there was a basis for demurrage liability which was uncontroverted—the grain facility's status as a "consignee." *See id.* at 1349, 1352; *see also S. Tec Dev. Warehouse*, 337 F.3d at 820. The *Bartlett* court held that the defendant, as consignee, had the burden "to produce sufficient evidence to establish its defense to plaintiff's claim for demurrage," which was that the defendant was not liable for demurrage charges resulting from delay occasioned by the railroad's failure to switch in accordance with normal procedures. *Id.* at 1353. Such a defense required evidence "that during the ordinary and usual switching time for the consignee's facilities":

(1) "there was sufficient capacity on the consignee's siding for additional cars," (2) "the consignee had the actual ability to have unloaded the additional cars had they been placed on its siding," and (3) "the railroad failed to place sufficient cars on the consignee's siding." *Id*.

Here, the rail cars at issue were the freight, were empty, and thus were not subject to unloading, and, most importantly, the Plaintiff has not argued or shown that the Defendants are a consignee.[14] Thus, the Court finds the Plaintiff's reliance on *Bartlett* misplaced; and the Court finds nothing therein to support placing the burden on the Defendants to show that they did not detain the rail cars when, as here, the freight is the empty rail cars, rather than the goods within the rail cars, and the Defendants are not a consignee.

Therefore, the Court concludes that the Plaintiff's demurrage tariff alone is not a sufficient basis for the Defendants' demurrage liability under either the authority the Plaintiff cited or under the Seventh Circuit precedent reviewed by the Court. Because the Plaintiff has not proven that the Defendants detained the rail cars at issue and has failed to show any of the six bases for demurrage liability, the Plaintiff's claim that the Defendants owe the demurrage charges therefore fails.

2.      *49 C.F.R. § 1333.2*

The Plaintiff's reference to 49 C.F.R. § 1333.2 for the proposition that "demurrage will be governed by the demurrage tariff of the serving carrier," appears to suggest that its demurrage tariff is a basis for the Defendants' demurrage liability. But 49 C.F.R. § 1333.2 exists in conjunction with 49 C.F.R. § 1333.3(a). Effective July 15, 2014, the Surface Transportation

---

[14] *See supra* note 11.

Board ("STB") promulgated 49 C.F.R. § 1333.3(a),[15] which specifically provides for demurrage liability for

> [a]ny person receiving rail cars from a rail carrier for loading or unloading who detains the cars beyond the period of free time set forth in the governing demurrage tariff . . . if the carrier has provided that person with actual notice of the demurrage tariff providing for such liability prior to the placement of the rail cars.

49 C.F.R. § 1333.3(a).

However, the Plaintiff, the party with the burden on the issue of liability, only addressed 49 C.F.R. § 1333.3(a) in its closing arguments and Proposed Findings of Fact and Conclusions of Law to argue that the actual notice requirement is *inapplicable* because the Plaintiff's demurrage tariff was issued before the regulation's effective date.[16] In closing arguments, the Plaintiff emphasized that it was making this argument in anticipation of a contrary contention by the Defendants about the actual notice requirement. Yet the Plaintiff has made no argument for 49 C.F.R. § 1333.3's applicability as a basis for the Defendants' demurrage liability and does not mention or address the other elements for liability under Section 1333.3 in its Proposed Findings of Fact and Conclusions of Law. For example, the Plaintiff does not point to evidence in the record demonstrating that the Defendants received the rail cars "for loading or unloading."[17]

---

[15] The Surface Transportation Board (STB) has jurisdiction over the rules, practices, and demurrage rates for transportation by rail carriers. *See* 49 U.S.C. §§ 10501, 10702, 10707. The STB promulgated 49 C.F.R. § 1333.3 based on this authority.

[16] The Seventh Circuit has previously noted in dicta that Section 1333.3 was inapplicable to the case it was reviewing "because [Section1333.3] took effect on July 15, 2014, and the demurrage on Wisconsin Central's cars accrued in November 2013." *TiEnergy, LLC*, 894 F.3d at 856 n.3 (declining to address Section 1333.3 because the charges at issue all accrued before the regulation's effective date). Thus, the Seventh Circuit approaches the applicability of Section 1333.3 based on the demurrage charges' accrual date. *See id*. Here, the demurrage charges at issue accrued from July 2014 to October 2016, and the Plaintiff did not make an argument for or against Section 1333.3's application based on the accrual date.

[17] Although not discussed by the parties, Section 1333.3(a) requires a party to have received the rail cars "for loading or unloading." Interpreting this phrase to include receiving rail cars as freight renders the phrase "for loading or unloading" superfluous, which is a result "[c]ourts should avoid." *United States v. Alvarenga-Silva*, 324 F.3d 884, 887 (7th Cir. 2003) ("Courts should avoid statutory constructions that render another part of the same provision superfluous."). At most, the record here shows the East Chicago

Also, as discussed above, the Plaintiff has failed to establish that the *Defendants* detained the rail cars at issue.

As a result, the Court finds that, because the Plaintiff has not asserted this regulation as a basis for the Defendants' liability, the Plaintiff has waived any argument that Section 1333.3 provides a basis for the Defendant's liability; therefore, the Court need not resolve the parties' secondary arguments related to Section 1333.3, such as the arguments regarding "actual notice." The Court notes, however, that even if the Plaintiff had raised Section 1333.3 as a basis for the Defendants' liability, the Plaintiff has not proven that the Defendants detained the rail cars at issue, as discussed above. Therefore, Section 1333.3 is not a basis for liability in this case.

### 3. *Conclusion*

Accordingly, the Plaintiff's claim that the Defendants owe the demurrage charges fails. As such, the Court does not address the Plaintiff's tertiary argument that the Defendants did not adhere to the requirement in Plaintiff's Tariff 6004-D, Item 400, that charges must be disputed in writing within the provision's specified time period. For the same reason, the Court does not address the parties' dispute about whether Item 1300 or Item 2005 of Tariff 6004-A applies to the demurrage charges; and the Court also does not address the defense the Defendants raised in its Amended Answer [ECF No. 59] that the Plaintiff is estopped from assessing demurrage charges against United Transportation.[18]

---

Facility received the rail cars at issue based on the parties' stipulation to that fact. The Plaintiff did not show that receipt was "for loading or unloading."

[18] Because there is no allegation in this case of unreasonable discrimination under 49 U.S.C. § 10741, the Court does not address the Plaintiff's argument raised in its Proposed Conclusions of Law on "unreasonable discrimination."

**B.      Holding Charges**

The Plaintiff brings a claim for $6,900 in holding charges, alleging that the Defendant

failed to pay the holding charges assessed between March 2015 and November 2015 under the

Plaintiff's Tariff 9347-H, Item 240. The Defendants contend that the Plaintiff has not met its

burden to prove the Defendants owe the charges, though they do not dispute their liability under

Tariff 9347-H generally.

Tariff 9347-H, Item 240, provides for a holding charge when a rail car is sent to the

Plaintiff "without final shipping directions or shipping directions with incorrect, incomplete or

conflicting instructions." Tariff 9347-H, Supplement 1, provides that the holding charge is $250.

Sheppard's testimony establishes that the Plaintiff's general policy was to notify the customer

that the Plaintiff needed instructions, and if the proper bill was not received by the Plaintiff by

10:00 a.m. on the day following notice, then the Plaintiff assessed the $250 holding charge. Here,

however, the record is devoid of the date and time that the Plaintiff received the proper shipping

instructions, and thus the Court is unable to verify whether the Plaintiff correctly assessed the

charges.

Therefore, the Plaintiff has not proven that the Defendants owe the $6,900 in holding

charges, and the Plaintiff's claim fails. As a result, the Court does not address the parties'

arguments on whether the Defendants had notice of the Plaintiff's Tariff 9347-H.

**C.      Freight Charges**

The Plaintiff brings a claim for $26,800 in freight charges, alleging that the Defendants

failed to pay freight charges assessed between July 2014 and October 2016 in accordance with

the Plaintiff's Published Tariff 8000 Series. It is undisputed that $26,800 in freight charges was

owed to the Plaintiff as of December 2016, Defendant Pellin delivered a check for $26,800 to the

Plaintiff dated December 25, 2016, and the Plaintiff did not cash the check. It is also undisputed that Defendant Pellin included with the $26,800 check a copy of the December 2016 aging report for the holding charges with a notation indicating "Final Payment" and that the Plaintiff's earlier November 2016 aging report for all charges listed $255,240 as the total amount owed.

Without citing any legal authority, the Defendants argue that the Plaintiff waived its right to payment of the freight charges by relinquishing its right to cash the check.[19] Waiver occurs when there "is an intentional relinquishment of a known right, requiring both knowledge of the existence of the right and intention to relinquish it." *Pohle v. Cheatham*, 724 N.E.2d 655, 659 (Ind. Ct. App. 2000) (citing *Matter of S.L.*, 599 N.E.2d 227, 229 (Ind. Ct. App. 1992)). Correspondingly, "waiver may be shown either by express or implied consent." *Id*. As a result, "the right may be lost by a course of conduct." *Id*. "However, waiver is an affirmative act and mere silence, acquiescence or inactivity does not constitute waiver unless there was a duty to speak or act." *Id*. Here, the record does not demonstrate that the Plaintiff relinquished its right to the $26,800 owed for freight charges.

To argue waiver, the Defendants point to a dispute of fact about Defendant Pellin's notation on the copy of the aging report that he gave to the Plaintiff with the $26,800 final check: the copy of the aging report submitted in evidence included a typed notation, but Pauwels testified that he remembered a handwritten notation. The Defendants also assert that the Plaintiff lacked a valid reason for not accepting the payment because Defendant Pellin always included an explanation with checks to the Plaintiff and did not intend for the check to extinguish other

---

[19] In their Answer to First Amended Complaint [ECF No. 59], the Defendants also raised accord and satisfaction as an affirmative defense to the freight charges. However, in closing arguments at trial, Defendants' counsel stated they are not raising accord and satisfaction, and this was not addressed in the Defendants' Proposed Findings of Fact and Conclusions of Law. As a result, the Court considers this affirmative defense abandoned.

charges and because the Plaintiff did not contact Defendant Pellin after he had inquired about the uncashed check. However, the Plaintiff's final bill with all outstanding charges was for $255,240 (as listed on the November 2016 aging report), and it is undisputed that Defendant Pellin included the December 2016 aging report (for the freight charges) with a notation (it is immaterial whether the notation was typed or handwritten, although the Court finds it was typed) indicating "final payment" along with the $26,800 check. Also, Defendant Pellin testified that he intended for the $26,800 check to leave a "zero balance." Under these circumstances, the Court concludes that it was reasonable for the Plaintiff to be cautious about cashing the check to avoid the Defendants later asserting accord and satisfaction as an affirmative defense to payment of the other charges. Therefore, the Defendants have not established the affirmative defense of waiver by a preponderance of the evidence. Thus, the $26,800 in freight charges remains due. Accordingly, the Plaintiff is entitled to recover the $26,800 in freight charges.

Next, the Plaintiff claims that United Transportation and United Rail are both liable for the freight charges but mainly focuses its argument on United Rail's liability with the aim of holding Defendant Pellin personally liable through United Rail. In closing arguments, the Plaintiff argued for United Rail's liability by asserting that Defendant Pellin continued to contract as United Rail after its dissolution, as shown by shipping documents. For the following reasons, the Court finds that Defendant United Transportation is liable for the $26,800 in freight charges owed to the Plaintiff and that United Rail is not liable for those charges. Thus, Defendant Pellin is not personally liable for the freight charges based on this theory.

As to United Transportation's contractual liability, it is undisputed that the final check Defendant Pellin delivered to the Plaintiff was a check for $26,800 from United Transportation's checking account in payment of the outstanding freight charges. Also, United Transportation

paid the invoices from the Plaintiff, even though the Plaintiff directed the invoices to United Rail, paying the Plaintiff approximately $4.1 million from 2002 through 2017 for freight charges. This conduct proves that United Transportation intended to assume responsibility for the $26,800 in freight charges. *See S. Tec Dev. Warehouse, Inc*., 337 F.3d at 820, 822. Therefore, the Court concludes United Transportation is liable for the freight charges.

As to United Rail's contractual liability, the Plaintiff does not point to any facts that support such an inference. The primary circumstantial evidence that the Plaintiff presented was that some shipping documents list United Rail as the "shipper." The shipping documents, however, fail to indicate either that United Rail received or sent the rail cars that incurred the freight charges at issue—as the Plaintiff does not connect those shipping documents to any other part of the record—or that the shipping documents were the transportation contracts for the rail cars at issue. Also, after United Transportation took over operation of the East Chicago Facility in 2002, it was the Plaintiff that continued to invoice United Rail and it was the Plaintiff's employees who continued to refer to United Rail as the Plaintiff's customer. However, these facts do not support an inference that United Rail was a party to the transportation contracts for the rail cars at issue or that United Rail intended to assume responsibility for the freight charges. *See S. Tec Dev. Warehouse, Inc*., 337 F.3d at 815, 822; *Evans Prods. Co.*, 729 F.2d at 1113.[20] Therefore, the Court concludes that United Rail is not liable for the freight charges.

---

[20] In its Proposed Conclusions of Law, the Plaintiff argues that United Rail is liable for the charges at issue because United Rail continued "doing business" after dissolution, providing several examples that the Plaintiff considers are instances of United Rail "doing business" and citing two cases in support. *See People ex rel. Stead v. Chic., I. & L. Ry. Co*., 79 N.E. 144, 147 (Ill. 1906); *Wenige-Epperson, Inc. v. Jet Lite Prods., Inc*., 328 N.E.2d 665, 667 (Ill. App. Ct. 1975). The cases that the Plaintiff cites involve determinations of whether a foreign corporation was "doing business" in Illinois and thus: (1) was required under an Illinois statute to file a yearly report, 79 N.E. at 145; or (2) was required to obtain a certificate of authority to file a civil action in Illinois, 328 N.E. 2d at 667. Here, however, the issue is whether United Rail is contractually liable to the Plaintiff for freight charges. Ways that a foreign corporation may be considered "doing business" in Illinois to fall under requirements for "doing

The Plaintiff's argument for Defendant Pellin's personal liability for the freight charges thus fails because it presumes United Rail's liability. The Plaintiff cites *Laborers' Pension Fund v. R & W Clark Construction Inc.*, for the proposition that "an individual owner or operator of a former corporate entity is contractually obligated for debt incurred during the time that the corporation operated while it was dissolved." No. 16 C 06885, 2021 WL 1172698, at *3 (N.D. Ill. Mar. 29, 2021) (citing *Est. of Plepel v. Indus. Metals, Inc.*, 450 N.E.2d 1244, 1246 (Ill. App. Ct. 1983)).[21] This means that "personal liability may be imposed on an officer of a dissolved corporation who enters into contracts on behalf of the corporation after dissolution." *Forsythe-Fournier v. Isaacson*, 857 N.E.2d 826, 828 (Ill. App. Ct. 2006) (quoting *Est. of Plepel*, 450 N.E.2d at 1246). Although it is undisputed that United Rail was dissolved in 2009 and reinstated in 2018, under the caselaw cited by the Plaintiff, Defendant Pellin is not personally liable unless United Rail had a contractual liability for the freight charges. Because the Plaintiff has not proven United Rail's contractual liability for the freight charges, the Court concludes that Defendant Pellin is not personally liable for the freight charges based on this theory of liability. As a result, the Court need not address the parties' arguments as to whether Defendant Pellin is personally liable due to United Rail's reinstatement because the arguments also presume United Rail's liability.

---

business" in Illinois are not equivalent to ways that a corporation may be contractually liable to another business for freight charges under the Seventh Circuit standard for liability for freight charges. As a result, the Court declines to address the Plaintiff's "doing business" argument any further.

[21] The parties previously agreed that the issue of whether Defendant Pellin is personally liable vis-à-vis his position as United Rail's president and sole shareholder is governed by Indiana law. *See* Feb. 23, 2022 Order, ECF No. 89 at 9. Indiana law provides that "[t]he law of the jurisdiction of formation of an entity governs . . . the liability that a person has as an interest holder or governing person for a debt, obligation, or other liability of the entity." Ind. Code. § 23-0.5-5-1(a)(2). This means that Illinois law governs the question of whether Defendant Pellin will be personally liable for the charges because United Rail is incorporated in Illinois.

Accordingly, United Transportation owes the Plaintiff $26,800 in freight charges.[22]

**D.     Prejudgment Interest**

In closing arguments and the Proposed Conclusions of Law, the Plaintiff requests

prejudgment interest. The Defendants did not respond to this request. "[P]rejudgment interest is

presumptively available to victims of federal law violations." *McRoberts Software, Inc. v. Media*

*100, Inc.*, 329 F.3d 557, 572 (7th Cir. 2003) (quoting *Gorenstein Enters., Inc. v. Quality Care-*

*USA, Inc.*, 874 F.2d 431, 436 (7th Cir. 1989)). The Court has discretion to decide whether and

how to award prejudgment interest, "although there is a presumption in favor of granting such

interest." *Frey v. Hotel Coleman*, 903 F.3d 671, 682 (7th Cir. 2018). "Discretion must be

exercised according to law, which means that prejudgment interest should be awarded unless

there is a sound reason not to do so." *Matter of Milwaukee Cheese Wis., Inc.*, 112 F.3d 845, 849

(7th Cir. 1997). A "legitimate dispute" over the amount owed is one such reason. *In re*

*Burlington N., Inc. Emp. Pracs. Litig.*, 810 F.2d 601, 609 (7th Cir. 1986). Here, the parties have

not adequately briefed whether the Court should award the Plaintiff prejudgment interest.

Accordingly, the Court will set a scheduling order for the parties to brief whether prejudgment

interest should be awarded in this case.

## CONCLUSION

For the reasons stated above, the Court finds that Plaintiff Indiana Harbor Belt Railroad is

entitled to a verdict in its favor on its claim in its Amended Complaint for freight charges in the

amount of $26,800 against Defendant United Transportation Group, Inc. but that the Plaintiff is

not entitled to a verdict in its favor as to the claims: (1) remaining against Defendant United

---

[22] For the same reasons as discussed in note 11 above, the Defendants are not liable for the freight charges
as a consignee.

Transportation Group, Inc. for demurrage charges and holding charges; and (2) against Defendant Michael V. Pellin individually and doing business as United Rail Services Inc.

Entry of judgment is withheld until the Court determines whether to award prejudgment interest on the award of $26,800 in freight charges against Defendant United Transportation Group, Inc. The Court ORDERS the Plaintiff to file its motion for prejudgment interest on or before January 8, 2024, Defendant United Transportation Group, Inc. to file a response on or before January 23, 2024, and the Plaintiff to file a reply on or before January 31, 2024.

SO ORDERED on December 12, 2023.

s/ Theresa L. Springmann
JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT